## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| MERRY KOGUT, derivatively on behalf of UNITEDHEALTH GROUP INCORPORATED, ) ) ) | |
| Plaintiff, | Case No. _____ |
| v. | JURY TRIAL DEMANDED |
| STEPHEN HEMSLEY, ANDREW WITTY, TIMOTHY FLYNN, PAUL GARCIA, KRISTEN GIL, MICHELE HOOPER, F. WILLIAM MCNABB, III, VALERIE MONTGOMERY RICE, and JOHN NOSEWORTHY, | |
| Defendants, | |
| and | |
| UNITEDHEALTH GROUP INCORPORATED, | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Merry Kogut ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant UnitedHealth Group Incorporated ("UnitedHealth" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Stephen Hemsley ("Hemsley"), Andrew Witty ("Witty"), Timothy Flynn ("Flynn"), Paul Garcia ("Garcia"), Kristen Gil ("Gil"), Michele Hooper ("Hooper"), F. William McNabb, III ("McNabb"), Valerie Montgomery Rice ("Montgomery Rice"), and John Noseworthy ("Noseworthy") (together, the "Individual Defendants," and collectively with UnitedHealth, "Defendants") for breaches of fiduciary duties, waste of corporate assets, unjust enrichment, gross mismanagement, and/or the aiding and abetting thereof, as well as violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against

the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of internal corporate documents produced by Defendants to Plaintiff's counsel,[1] a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding UnitedHealth, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Company's current and former officers and directors from at least September 22, 2021 through the present, both dates inclusive (the "Relevant Period").

2. UnitedHealth is a health care and well-being company that claims its "mission to help people live healthier lives and help make the health system work better for everyone."

3. UnitedHealth has "two distinct, yet complementary businesses – Optum and UnitedHealthcare." UnitedHealthcare is the largest insurance provider in the country, offering health insurance to individuals, employers, and small businesses, while Optum provides healthcare-related services, including software solutions, payment services, and data analytics.

4. In order to circumvent the downward pressure the Affordable Care Act (the "ACA") placed on UnitedHealthcare's profits, the Company increased its vertical expansion in

---

[1] References to "UHG_ BROWN220_00000___" are to the Books and Records.

2011 by launching Optum. Optum operates in the health insurance market for first-pass claims editing, which is used to process all claims that a health insurer receives. Notably, first-pass claims editing evaluates whether a particular claim should be paid or rejected. Another critical input for U.S. health insurance markets is the Electronic Data Interchange ("EDI") clearinghouses, which allow for the transmission of claims, remittances, and other critical information between payers and providers.

5.     UnitedHealth previously operated an EDI clearinghouse prior to the Relevant Period through Optum, and UnitedHealthcare was its largest customer.

6.     Following the enactment of the ACA, the Company continued to expand, spending over $60 billion to establish a market power it could utilize to manipulate other players in the healthcare industry.

7.     On January 6, 2021, as part of this expansion process, the Company announced that, through Optum, it had completed its largest ever acquisition: Optum Insight acquired Change Healthcare ("Change") for $13 billion, which would be integrated into the Company's existing Optum business. Change was a healthcare technology company that operated a clearinghouse, acting as the "pipes" of the industry by processing insurance claims and moving data between entities. In its estimate, the Company represented to investors that over half of American insurance claims either "pass[ed] through (or touch[ed])" Change's systems.

8.     Optum's acquisition of Change raised concerns because it allowed the Company to earn revenue from both sides of the industry.

9.     Simply stated, UnitedHealthcare is the health insurance arm of UnitedHealth. It provides health benefit plans and manages insurance coverage for various groups, including employer-sponsored plans, individual plans, Medicare, Medicaid, military, and retiree programs.

UnitedHealthcare focuses on financing and coordinating care by paying for medical services through insurance claims and provider networks. Essentially, UnitedHealthcare acts as the payer, ensuring people have access to healthcare services through insurance coverage.

10.    Optum Health is one of the three main businesses under Optum, the technology-enabled health services division of Nominal Defendant UnitedHealth (the other two being OptumRx and OptumInsight). Optum Health focuses on delivering direct healthcare services and care delivery. It operates a provider network, employs physicians (reportedly 90,000 as of 2023), and provides patient-centered care through clinics, urgent care centers, and other facilities. Optum Health also leverages data and technology to improve care quality, manage population health, and support value-based care models that reward providers for quality and outcomes rather than service volume. Unlike UnitedHealthcare, Optum Health does not sell insurance but directly provides or enables healthcare services.

11.    A patient insured by UnitedHealthcare might receive care at an Optum Health clinic, where Optum's technology and data analytics help coordinate treatment, improve outcomes, and control costs, while UnitedHealthcare covers the financial aspect of the care.

12.    This interplay between subsidiaries allows the Company (Nominal Defendant UnitedHealth) to operate as both a payer (via UnitedHealthcare) and a provider (via Optum Health), creating a comprehensive healthcare ecosystem. However, this relationship has faced scrutiny from the outset for potential conflicts of interest and antitrust concerns due to its market dominance

13.    The United States government held these concerns and, on February 24, 2022, the United States Department of Justice ("DOJ") sued to block the Company's acquisition of Change, citing violations of federal antitrust laws (the "First DOJ Action"). The DOJ claimed, *inter alia*,

that the Company would gain access to sensitive data that it would then be able to utilize against its competitors.

14.    Nevertheless, during the Relevant Period, the Individual Defendants publicly maintained that Optum utilized "best-in-class firewalls and compliance programs that maintain[ed] the integrity of [] customers' data and information" and stated that the Company had "internal firewalls that prevent the sharing of competitively sensitive information across business units."

15.    In addition, during the Relevant Period, the Individual Defendants engaged in and/or caused the Company to engage in a scheme to artificially inflate the fees the Company collected from the government by intentionally "upcoding" its customers under Medicare Advantage. Upcoding happens when a healthcare provider submits codes for more serious conditions than the patient was diagnosed with to obtain greater reimbursement.

16.    The Individual Defendants effectuated this scheme by, among other things, adding unwarranted diagnosis codes to its customers' accounts. In addition, the Company paid bonuses to providers who engaged in upcoding, thereby motivating them to identify new and unwarranted diagnoses in otherwise healthy patients. The Company also instructed providers to use "buddy codes," whereby they would add multiple new diagnoses based upon preexisting diagnoses.

17.    UnitedHealth also employed the "HouseCalls" program, sending nurse practitioners to patients' homes to use tools, including software engineered to suggest profitable diagnoses and unreliable medical devices, to diagnose nonexistent conditions (collectively, the "Upcoding Misconduct").

18.    The plan succeeded, with the Company securing $8.7 billion in taxpayer funds in 2021 for diagnosis codes that no physician had treated.

19.    The Company also was simultaneously participating in other anti-competitive

practices, including forcing providers into unfair contracts, threatening partner-hospitals with cancellation if they worked with primary care practices that competed with Optum, and forcing those hospitals into unfair contract terms under the threat of cancellation (collectively, the "Anti-Competitive Misconduct").

20.     As a result of the Anti-Competitive Misconduct, the Company was notified on October 10, 2023, that the DOJ had initiated a "non-public antitrust investigation into the company" (the "DOJ Investigation").

21.     The truth would not emerge for over four months, when on February 27, 2024, *The Wall Street Journal* reported on the DOJ Investigation.[2] The article identified that the DOJ Investigation was focused on, *inter alia*, "[m]edicare billing issues, including the Company's practices around documenting patients' illnesses," as well as other anticompetitive practices at Optum and UnitedHealthcare.[3]

22.     On this news, the price of the Company's stock fell $27.04 per share, or approximately 5.1%, from a closing price of $525.32 per share on February 26, 2024 to close at $498.28 per share on February 28, 2024.

23.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about UnitedHealth's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose,

---

[2] Christopher Weaver and Anna Wilde Mathews, *U.S. Opens UnitedHealth Antitrust Probe*, WALL ST. J. (Feb. 27, 2024), https://www.wsj.com/health/healthcare/u-s-launches-antitrust-investigation-of-healthcare-giant-unitedhealth-ff5a00d2?reflink=desktopwebshare_permalink.

[3] *Id.*

*inter alia*, that: (1) the Company and the Individual Defendants were engaging in the Anti-Competitive Misconduct and the Upcoding Misconduct; (2) through these schemes, the Individual Defendants opened the Company to a significant risk of litigation once the scheme was inevitably uncovered; (3) the Company overstated the capabilities of Optum's firewalls while actively concealing Optum's ability to circumvent those same firewalls; and (4) this too opened the Company up to a significant risk of investigation and litigation. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

24.    The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

25.    Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

26.    In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing UnitedHealth to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between April 2022 and February 2024, UnitedHealth repurchased approximately 14 million shares of UnitedHealth common stock, costing the Company ***approximately $7.3 billion***. As the Company's common stock was actually worth only $498.28 per share, the price at which it was trading when markets closed on February 28, 2024, the Company overpaid for repurchases of its own common stock by ***approximately $317.5 million***.

27.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls while two of the Individual Defendants engaged in lucrative insider

trading, reaping personal profits of *approximately $222.5 million*.

28.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Board Chairman and Chief Executive Officer ("CEO"), its former CEO, and the former CEO of UnitedHealthcare to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Minnesota (the "Securities Class Action"), as well as prompted the First DOJ Action and the DOJ Investigation, all of which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company has been subject to extensive legal and financial liabilities. As a result, the Company will have to expend many millions of dollars.

29.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants — most of whom are the Company's current directors—their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Company's Chairman, former CEO's, and former UnitedHealthcare CEOs' liability in the Securities Class Action, and because they are beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of UnitedHealth's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C.

§78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

31.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

32.     This derivative action is not a collusive action to confer jurisdiction on federal court that would not otherwise have such jurisdiction.

33.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce and the facilities of a national securities market.

34.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Nominal Defendant UnitedHealth is headquartered in this District, conducts business in this District, and several of the acts and omissions charged herein occurred in substantial part in this District.

## THE PARTIES

### Plaintiff

35.     Plaintiff is a current shareholder of UnitedHealth and has continuously held Company common stock since October 19, 2020.

### Nominal Defendant UnitedHealth

36.     UnitedHealth is a Delaware corporation with its principal executive offices at 1 Health Drive, Eden Prairie, Minnesota 55344. UnitedHealth also has principal executive offices at 655 New York Avenue NW, Washington, DC 20001. UnitedHealth's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "UNH."

**Defendant Hemsley**

37.     Defendant Hemsley has served as a Company director since 2000, as Non-Executive Chair of the Board since November 2019, and as the CEO of the Company since May 12, 2025. Previously, Defendant Hemsley served as the Company's CEO from November 2006 until August 2017, and as Executive Chair of the Board from September 2017 until November 2019.

38.     During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Hemsley made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| October 25, 2021 | 125,000 | $451.46 | $56,432,330 |
| July 26, 2022 | 99,312 | $534.27 | $53,059,223 |
| October 17, 2023 | 121,515 | $540.58 | $65,688,578 |
| December 5, 2023 | 66,081 | $550.39 | $36,370,189 |

Thus, in total, before the fraud was exposed, he sold approximately 411,908 shares of Company common stock on inside information, for which he received approximately $211.5 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

39.     The Schedule 14A filed on April 21, 2025 (the "2025 Proxy Statement") stated the following about Defendant Hemsley:

> Stephen Hemsley is non-executive Chair of the Board of UnitedHealth Group and has served in this capacity since November 2019. Steve previously served as Executive Chair of the Board from September 2017 to November 2019, Chief Executive Officer from November 2006 to August 2017, President from May 1999 to November 2014, and Chief Operating Officer from November 1998 to November 2006. He joined the Company in 1997 and has been a member of the Board of Directors since 2000. In the past five years, Steve served as a director of Cargill, Inc.

**Defendant Witty**

40.    Defendant Witty served as the Company's CEO and as a Company director from February 2021 until resigning as CEO on May 12, 2025, and as a director on May 20, 2025. Prior to serving as CEO, Defendant Witty served as President of the Company from November 2019 until February 2021.

41.    During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Witty made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| July 18, 2022 | 11,376 | $527.90 | $6,005,390 |
| April 27, 2023 | 6,160 | $487.49 | $3,002,949 |
| July 19, 2023 | 4,000 | $506.19 | $2,024,760 |

Thus, in total, before the fraud was exposed, he sold 21,536 shares of Company common stock on inside information, for which he received approximately $11 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

42.    The 2025 Proxy Statement stated the following about Defendant Witty:

Andrew Witty has been Chief Executive Officer of UnitedHealth Group since February 2021. He was President of UnitedHealth Group from November 2019 to February 2021, Chief Executive Officer of Optum from July 2018 to April 2021, and a UnitedHealth Group director from August 2017 to March 2018. Prior to joining UnitedHealth Group, he was Chief Executive Officer and a board member of GlaxoSmithKline, a global pharmaceutical company, from 2008 to 2017.

**Defendant Flynn**

43.    Defendant Flynn has served as a Company director since 2017. He also serves as the Chair of the Compensation and Human Resources Committee (the "Compensation Committee") and as a member of the Governance Committee.

44.    The 2025 Proxy Statement stated the following about Defendant Flynn:

Timothy Flynn was Chairman of KPMG International (KPMG), a global professional services organization that provides audit, tax and advisory services, from 2007 until his retirement in 2011. From 2005 until 2010, he served as Chairman and from 2005 to 2008 as CEO of KPMG LLP in the U.S., the largest individual member firm of KPMG. Prior to serving as Chairman and CEO of KPMG LLP, Tim was Vice Chairman, Audit and Risk Advisory Services, with operating responsibility for Audit, Risk Advisory and Financial Advisory Services practices at KPMG LLP. He previously served as a trustee of the Financial Accounting Standards Board, a member of the World Economic Forum's International Business Council, and the International Integrated Reporting Council. In the past five years, Tim also served as a director of Alcoa Corporation and JPMorgan Chase & Co. Tim currently serves as a director of Cargill, Inc.

**Defendant Garcia**

45.    Defendant Garcia has served as a Company director since November 2021. He also

serves as a member of the Audit and Finance Committee (the "Audit Committee).

46.    The 2025 Proxy Statement stated the following about Defendant Garcia:

Paul Garcia is the retired Chairman and Chief Executive Officer of Global Payments Inc., a publicly traded, leading provider of electronic payment processing services, and served in that capacity from 1999 to 2014. Prior to his role at Global Payments, Paul served as President & CEO of NaBanco, an electronic credit card processor, from 1982 to 1995. He served as a director of Global Payments Inc., MasterCard International, West Corporation and The Dun & Bradstreet Corporation and, in the past five years, as a director of Truist Financial Corporation and Payment Alliance International, Inc.

**Defendant Gil**

47.    Defendant Gil has served as a director since December 2022. She also serves as a

member of the Audit Committee.

48.    The 2025 Proxy Statement stated the following about Defendant Gil:

Kristen Gil served as Vice President, Business Finance Officer at Alphabet, Inc. until January 2024. She held numerous senior positions at Alphabet since joining the company in 2007, including in business operations, strategy, and finance for Google Search, Maps, Research & AI, and Sustainability. Prior to joining Alphabet in 2007, Kristen worked at Marketron International and McKinsey & Company. In the past five years, Kristen also served as a director of Proofpoint, a cybersecurity company.

**Defendant Hooper**

49.     Defendant Hooper has served as a Company director since 2007 and as the Lead

Independent Director since October 2021.

50.     The 2025 Proxy Statement stated the following about Defendant Hooper:

Michele Hooper is Lead Independent Director of the Board of Directors of
UnitedHealth Group and has served in this capacity since October 2021. Michele
is President and CEO of The Directors' Council, a private company she co-founded
in 2003 that works with corporate boards to increase their independence,
effectiveness and diversity. She was President and CEO of Voyager Expanded
Learning, a developer and provider of learning programs and teacher training for
public schools, from 1999 until 2000. She previously served as President and CEO
of Stadtlander Drug Company, Inc., a provider of disease-specific pharmaceutical
care, from 1998 until its acquisition in 1999. Michele is a nationally recognized
corporate governance expert. In the past five years, Michele also served as a
director of PPG Industries, Inc.

**Defendant McNabb**

51.     Defendant McNabb has served as a Company director since 2018. He also serves

as the Chair of the Audit Committee and as a member of the Governance Committee.

52.     The 2025 Proxy Statement stated the following about Defendant McNabb:

F. William McNabb served as Chairman of The Vanguard Group, Inc. from 2010
until his retirement in 2018 and served as CEO from 2008 to 2017. He joined
Vanguard in 1986. In 2010, he became Chairman of the Board of Directors and the
Board of Trustees of the Vanguard group of investment companies. Earlier in his
career, Bill led each of Vanguard's client facing business divisions. Bill served as
the Chairman of the Investment Company Institute's Board of Governors from
2013 to 2016. He serves on the Wharton Leadership Advisory Board and the
Columbia Law School's Millstein Center Advisory Board. Bill is a board member
of CECP: The CEO Force for Good.

**Defendant Montgomery Rice**

53.     Defendant Montgomery Rice has served as a Company director since 2017. She

also serves as the Chair of the Health and Clinical Practice Policies Committee. During the

Relevant Period, she also served as a member of the Compensation Committee.

54.     The 2025 Proxy Statement stated the following about Defendant Montgomery Rice:

Valerie Montgomery Rice is President and Chief Executive Officer of the Morehouse School of Medicine, a medical school in Atlanta, Georgia. She has been President since 2014 and Chief Executive Officer since 2021. She was Dean of the Morehouse School of Medicine from 2011 to 2021 and Executive Vice President from 2011 to 2014. She was Dean of the School of Medicine and Senior Vice President of Health Affairs at Meharry Medical College from March 2006 to June 2009, and director of the Center for Women's Health Research from 2005 to 2011. Valerie also served previously as a Council Member of the National Institute of Health and National Center for Advancing Translational Science, and on the National Institute of Health's Minority Health and Health Disparities and Office of Research on Women's Health advisory councils, and the Association of American Medical Colleges Council of Deans administrative board. Valerie is a member of the National Academy of Medicine and a renowned infertility specialist and women's health researcher. In the past five years, Valerie also served as a director of 23andMe Holding Co.

**Defendant Noseworthy**

55.    Defendant Noseworthy has served as a Company director since 2019. He also serves as the Chair of the Governance Committee and as a member of the Compensation Committee and the Health and Clinical Practice Policies Committee.

56.    The 2025 Proxy Statement stated the following about Defendant Noseworthy:

John Noseworthy was the former Chief Executive Officer and President of Mayo Clinic until his retirement in December 2018. John joined Mayo Clinic in 1990 and served in various capacities, including as Chairman of Mayo Clinic's internal Board of Governors, member of the Board of Trustees, Professor of Neurology at Mayo Clinic College of Medicine & Science, Chair of Mayo's Department of Neurology, medical director of the Department of Development and Vice Chair of the Mayo Clinic Rochester Executive Board. John also served as editor-in-chief of Neurology, the official journal of the American Academy of Neurology. He was a Health Governor of the World Economic Forum and, in the past five years, served as a director of Merck & Co.

*Relevant Non-Parties*

**Brian Thompson**

57.    Brian Thompson ("Thompson") served as the CEO of UnitedHealthcare from April 2021 until his passing in December 2024. Thompson served in various roles at the Company starting in 2004 prior to his appointment as UnitedHealthcare CEO, such as serving as the CEO of

UnitedHealthcare's government programs, including the Medicare & Retirement and Community & States businesses.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

58.    By reason of their positions as officers, directors, and/or fiduciaries of UnitedHealth and because of their ability to control the business and corporate affairs of UnitedHealth, the Individual Defendants owed UnitedHealth and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage UnitedHealth in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of UnitedHealth and its shareholders so as to benefit all shareholders equally.

59.    Each director and officer of the Company owes to UnitedHealth and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

60.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of UnitedHealth, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

61.    To discharge their duties, the officers and directors of UnitedHealth were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

62.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of

the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of UnitedHealth, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, that their conduct posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

63.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

64.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of UnitedHealth were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Minnesota, Washington, DC, and the United States, and pursuant to UnitedHealth's corporate governance and applicable codes of conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how UnitedHealth conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of UnitedHealth and procedures for the reporting of the business and internal affairs to the Board and to investigate periodically, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that UnitedHealth's operations would comply with all applicable laws and UnitedHealth's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at

-17-

the expense of the Company; and

        (h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

65.    Each of the Individual Defendants further owed to UnitedHealth and the shareholders the duty of loyalty requiring that each favor UnitedHealth's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

66.    At all times relevant hereto, the Individual Defendants were the agents of each other and of UnitedHealth and were at all times acting within the course and scope of such agency.

67.    Because of their advisory, executive, managerial, directorial, and controlling positions with UnitedHealth, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

68.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by UnitedHealth.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

69.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

70.    The purpose and effect of the conspiracy, common enterprise, and/or common

course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; (ii) conceal adverse information concerning UnitedHealth's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

71.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is or was a director of the Company was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

72.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

73.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of UnitedHealth and was at all times acting within the course and scope of such agency.

## CORPORATE GOVERNANCE

### *UnitedHealth's Code of Conduct*

74. UnitedHealth's Code of Conduct ("Code of Conduct") "provides guidelines to help us sustain the highest possible standards of ethical behavior in our work." The Code of Conduct "applies to all employees, directors, and contractors".

75. In a section titled "Act with Integrity," the Code of Conduct provides, in relevant part:

> • Recognize and address conflicts of interest. Conflicts occur when you or your immediate family members' personal interests, relationships, outside employment, or activities affect, or appear to affect, your decision-making in your Company role. Conflicts can also occur between the Company's businesses, where one business unit could effectively exclude another business unit from conducting business with the government.
>
> * * *
>
> • Do not buy or sell any stock based on material, non-public information you have received. You must never use or disclose to others material, non- public information about UnitedHealth Group or another company as the basis for buying or selling stock.
>
> * * *
>
> • Each director or employee involved in UnitedHealth Group's disclosure process is responsible for the accuracy and completeness of facts regarding the Company. This includes representations to the Company's independent auditors, governmental regulators, and self-regulatory organizations. Directors and employees must review and critically analyze proposed disclosures or, where appropriate, delegate this task to others.

76. In the same section, under the subheading "Integrity of Books and Records," the Code of Conduct provides the following:

> UnitedHealth Group is committed to the integrity of its records, books, and financial and other reporting. Employees are responsible for ensuring that all books, records, accounting, and reporting are accurate and complete, and properly reflect the actual transaction event recorded and are retained according to Company policy. In addition, U.S. securities laws impose specific obligations on each director or employee involved in the Company's financial disclosure process, including the Senior Financial Officers. The Senior Financial Officers and the individuals who assist them in the disclosure processes must be familiar with and comply with all

controls and procedures that ensure that public reports and documents filed with the U.S. Securities and Exchange Commission meet the Company's obligations under U.S. securities laws and rules.

77.    In a section titled "Be Accountable," the Code of Conduct provides the following,

in relevant part:

> We share the responsibility for preventing fraud, waste, and abuse in the health care system. UnitedHealth Group has established processes for identifying, reducing, and combating fraud, waste, and abuse.
>
> Prompt reporting of suspected Code or policy violations and potentially illegal or unethical conduct to an appropriate Company representative requires the courage to acknowledge our mistakes and enables us to do whatever is needed to address them.
>
> Failing to report suspected violations or to cooperate with the investigation is itself a violation of Company policy and can lead to discipline up to and including termination of employment.
>
> If you have any concerns about reporting a potential violation to your manager, or if you have already done so but you believe the matter has not been addressed, contact your business Compliance Officer or the Compliance & Ethics HelpCenter. Managers who receive such reports are required to take immediate action, and involve Legal, Compliance, or People Team representatives, as appropriate.

78.    In the section "Comply with Fair Competition Laws and Company Policies," the

Code of Conduct provides the following, in relevant part:

> Many laws and regulations define and promote fair business practices to protect the competitive environment. For example, competition laws, known in the U.S. as antitrust laws, protect against practices that interfere with free competition. They are designed to promote a competitive economy in which each business enterprise has an opportunity to compete fairly on the basis of price, quality, and service, and in the employment marketplace. To comply with these laws, each employee, director, and contractor must deal fairly with the Company's customers, service providers, suppliers, competitors, and employees. No employee or director should take advantage of anyone through unfair-dealing practices.
>
> • **Avoid discussions with competitors that may appear to restrain competition unreasonably**. Communications or agreements with competitors regarding rates, prices, sales territories, provider reimbursement rates, employee salaries or other terms of compensation, benefits, and other topics related to UnitedHealth Group's businesses may violate applicable competition laws, resulting in severe penalties against the Company and, potentially, you. Although, there may be legitimate

business reasons to communicate with a competitor (for example, sometimes competitors are also customers, and we frequently interact with competitors at industry association meetings, educational industry seminars, or conferences that cover issues common to the whole industry), you should always make sure that your discussions in these contexts do not cross into the areas of prohibited subjects or activities. Consult your manager and the Legal Representative assigned to your business to understand the limits that may apply to these conversations in the context of the business you support.

(Emphasis in original.)

79.     In the section "Protect Personal Information," the Code of Conduct provides the

following, in relevant part:

**Protecting personal information is critical to our enterprise:**

• Personal information is a broad term that may include national identification numbers (such as Social Security numbers), dates of birth, financial and medical information, and other information that identifies or relates to a particular individual.

(Emphasis in original.)

80.     In the same section, under the subheading "Protect Privacy, Ensure Security," the

Code of Conduct provides the following, in relevant part:

• **Understand the rules regarding handling personal information, including restrictions on transferring or accessing personal data from individuals who reside in another country.** Recognize that part of your day-to-day responsibilities may include access to and use of someone's personal information and that the use or disclosure of such information is governed by laws, regulations, customer contracts, and Company policies. If you are unsure how to handle such information appropriately, ask one of the Resources listed in this section.

* * *

• **Keep it private; keep it secure.** Always ensure that you are accessing, storing, or disclosing personal information only as necessary for your job and only to the extent required for business purposes, and that you are doing so in a secure manner appropriate to the sensitivity of the information and applicable law or policies.

(Emphasis in original.)

81.     In violation of the Code of Conduct, the Individual Defendants (as key officers and

as members of the Company's Board) conducted little, if any, oversight of the Company's

-22-

engagement in the Individual Defendants' schemes to enact the Anti-Competitive Misconduct, the

Upcoding Misconduct, or to issue materially false and misleading statements to the public and to

facilitate and disguise the Individual Defendants' violations of law, including, but not limited to,

breaches of fiduciary duty, gross mismanagement, unjust enrichment, waste of corporate assets,

and abuse of control. In violation of the Code of Conduct, the Individual Defendants consciously

disregarded their duties to comply with the applicable laws and regulations, engage in fair dealing,

avoid using corporate opportunities for personal gain, avoid conflicts of interest, appropriately

maintain the Company's books, records, accounts, and financial statements, and make accurate

filings with the SEC.

### *Audit Committee Charter*

82.     UnitedHealth's Audit and Finance Committee Charter (the "Audit Committee

Charter") details the purpose of the Audit Committee as:

> The primary purpose of the Committee is (a) to assist the Board of Directors (the "Board") in fulfilling its oversight responsibilities relating to (i) the conduct and integrity of the Company's financial reporting to any governmental or regulatory body, the public or other users thereof, (ii) the Company's compliance with legal and regulatory requirements including privacy, cybersecurity and data protection, (iii) the efficacy of the Company's enterprise risk management structure and key processes, (iv) the qualifications, engagement, compensation, independence and performance of the Company's independent outside auditor, and (v) the performance of the Company's General Auditor and internal audit function, and (b) to prepare the report of the Committee required by the Securities and Exchange Commission ("SEC") to be included in the Company's annual proxy statement.

> The Committee's job is one of oversight. The Company's management is responsible for preparing the Company's financial statements and the independent outside auditor is responsible for auditing the annual financial statements and reviewing the quarterly financial statements. The Committee recognizes that financial management (including the General Auditor and internal auditing function), as well as the independent outside auditor, have more direct knowledge and detailed information about the Company than do Committee members. Consequently, in carrying out its oversight responsibilities, the Committee is not providing any expert or special assurance as to the Company's financial statements or any professional certification as to the independent outside auditor's work.

83.    In the section, "Responsibilities and Duties," under the subheading "Documents/Reports Review," the Audit Committee Charter states:

• Meet to review and discuss with management and the independent outside auditor the Company's annual and quarterly financial statements, including reviewing the Company's specific disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations. Based on its discussions with management and the independent outside auditor, the Committee shall recommend to the Board of Directors whether the Company's annual financial statements should be included in the Company's Annual Report on Form 10-K (or the Annual Report to Shareholders).

• Review the Annual Report on Form 10-K prior to filing.

• Discuss with management earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies. Discussion of earnings releases as well as financial information and earnings guidance may be done in a general manner (i.e., discussions of the types of information to be disclosed and the type of presentation to be made).

• Discuss significant findings and recommendations of the Company's independent outside auditor and the General Auditor and internal auditors, together with management's responses to those findings and recommendations.

• Review and discuss with the Company's Chief Executive Officer and Chief Financial Officer the procedures undertaken in connection with the Chief Executive Officer and Chief Financial Officer certifications for Forms 10-K and Forms 10-Q, including their evaluation of the Company's disclosure controls and procedures and internal controls.

• Prepare the Committee report required by SEC rules to be included in the Company's annual proxy statement.

84.    In the same section, under the subheading "Internal Audit," the Audit Committee Charter states:

• Review and approve the annual audit plans for the internal audit function and all material changes to such plans.

• Review and concur in the appointment and termination of the General Auditor.

• Periodically review and approve changes (if any) to the internal audit charter.

• Review significant internal audit results, including any problems or difficulties, together with management's action plans.

• Discuss regularly with the Company's General Auditor, the budget and staffing of the internal audit function, including responsibilities, organizational structure, auditor qualifications, and quality assurance reviews.

• Review the qualifications, performance and objectivity of the internal audit function.

85.    In the same section, under the subheading "Enterprise Risk Management," the

Audit Committee Charter states:

• Review with management, the Company's enterprise risk management framework, including the governance structure, the guidelines and policies for assessing, identifying, managing, monitoring and reporting of significant risks.

• Meet periodically with management to review the Company's significant risks and the steps management has taken to monitor, control or mitigate such risks.

86.    In the same section, under the subheading "Other Activities," the Audit Committee

Charter states, in relevant part:

• Review with management the system the Company has in place to ensure that the Company's financial statements, reports, and other financial information disseminated to governmental organizations and the public satisfy legal requirements.

• Review and assess the effectiveness of the Company's policies, procedures and resource commitment in the areas of compliance, ethics, and privacy, by interacting with the leadership and management responsible for these functions.

• Consider any tax issues, legal and regulatory matters or employee complaints or similar matters brought to the attention of the Committee that may have a material impact on the Company's financial statements or accounting policies.

• Review and assess the effectiveness of the Company's policies, procedures and resource commitment in the areas of cybersecurity and data protection, including key risk areas and mitigation strategies.

* * *

• Oversee and review reports from the Chief Compliance and Ethics Officer regarding compliance with its Code of Business Conduct and Ethics and Principles of Ethics and Integrity.

• Receive and review periodic reports regarding matters relating to the Company's compliance with legal and regulatory requirements from the Chief Compliance and Ethics Officer, who has express authority to communicate directly with the

Committee as necessary.

87.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' schemes to cause the Company to enact the Anti-Competitive Misconduct, enact the Upcoding Misconduct, and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. Also, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Furthermore, they failed to maintain internal controls.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background of UnitedHealth

88.    UnitedHealth started in 1977 as a health insurance company, and has since grown to become the largest health insurer in the United States. The Company operates in two business areas: UnitedHealthcare (insurance), and Optum (healthcare services).

89.    UnitedHealthcare offers employer-based and individual insurance plans to over 35 million members across 150 countries as of the end of 2023. UnitedHealthcare also provides a Medicare Advantage program to Medicare-eligible members.

90.    Optum was created by the Company in April 2011 to house the Company's non-insurance business. Optum operates in three separate areas. Optum Health is a healthcare provider business, delivering primary care, specialty care, urgent care, and surgery directly to patients. Optum Rx is Optum's pharmacy benefit manager, providing pharmaceutical services to patients through its network of over 65,000 retail pharmacies. Lastly, Optum Insight is a data analytics

business that provides the industry with tools to provide data analytics, technology, and operations on the administrative side of the industry.

### *Government Legislation Forced UnitedHealth to Alter its Acquisition Strategy*

91.    Historically, the Company has been aggressive in acquiring subsidiaries to increase its market share. From its founding in 1977 through the 2000s, the Company purchased over 20 other health maintenance organizations ("HMOs") and insurance providers. The Company also began to partake in vertical expansion, focusing on healthcare companies with other specialties such as financial companies and software companies.

92.    Following the passage of the Balanced Budget Act in 1997, Medicare, a government-run health insurance program administered by Centers for Medicare & Medicaid Services ("CMS") for individuals aged 65 and older or disabled, was altered to allow for a number of traditional functions to be transferred to the private sector. Under this Act, Congress created Medicare Part C, otherwise known as Medicare Advantage. Through Medicare Advantage, Medicare patients can opt to receive their Medicare benefits through private insurance plans. The private insurers then get paid a flat fee for each Medicare Advantage member based on their health risks.

93.    In 2010, the ACA was passed in an attempt to provide healthcare to a larger proportion of United States citizens, improve the efficiency of how healthcare dollars are spent, and improve the patient experience. As a result, the ACA made changes intended to reduce costs, such as introducing the medical loss ratio ("MLR") requirements, which require insurers to spend a certain percentage of premiums from patients on actual patient care, as opposed to administrative costs and profit. Where insurers fall short of meeting their MLR requirements, the insurer has to pay a rebate to CMS. Large group plans and Medicare Advantage plans have MLRs of 85%, while smaller group plans have MLRs of 80%.

94.     Shortly after creating Optum, the Individual Defendants realized that the Company would be able to operate as both the payer and provider, thereby navigating the MLR requirements in a manner that preserved internal payments. This was accomplished through UnitedHealth utilizing Optum Health to provide medical care to its members. In doing this, the Company could increase payments made to Optum so as to meet the MLR requirements, while pocketing the overstuffed profits that were meant to be limited by the ACA.

95.     As a result, the Company quickly ramped up Optum's expansion into the healthcare provider space. Through this rapid expansion, Optum has quickly become the largest employer of physicians in the country, with relationships involving approximately 10% of all physicians in America. Since the enactment of the ACA, the Company has acquired the following physicians:



96.     One of the most pivotal recent acquisitions was when Optum Insight acquired Change in 2021 for $13 billion. Change was a healthcare technology company that operated a clearinghouse, acting as the "pipes" of the industry by processing insurance claims and moving data between entities. In its estimate, the Company represented to investors that over half of American insurance claims either "pass[ed] through (or touch[ed])" Change's systems.

97.     As a result of this expansion, the Company has amassed significant market power, allowing it to circumvent competition. Through its ability to exercise control over so many medical providers, the Company is able to favor Optum-owned groups when creating contracts, subsequently offering competitors less-favorable contract terms. Similarly, Optum can disadvantage other insurers by preventing its physicians from working with those companies. This has proven especially effective in rural areas with limited provider options, thereby limiting the insurance companies those providers work with.

### The Individual Defendants' Upcoding Misconduct Allowed the Company to Exploit Medicare Advantage

98.     Through the Medicare Advantage program, CMS pays insurers a flat rate for each member. Among the factors that determine the rate CMS pays is a risk adjustment, which takes member health status into account, allowing providers to receive higher payments for members who have more illnesses or require more care.

99.     CMS collects risk adjustments through diagnosis codes provided by the insurers. These codes must be documented in an approved medical record from the prior year, and the documentation must be pursuant to a face-to-face visit between the patient and their healthcare provider. Upon receiving these codes, CMS then calculates a "risk score" which determines the payment to be made on behalf of that particular member. These scores are calculated annually based on information from the year immediately preceding the plan year.

100.    The Individual Defendants utilized the Company's HouseCalls program in order to perpetrate the Upcoding Misconduct and inflate the risk assessments. HouseCalls is a service offered by UnitedHealthcare that sends nurse practitioners to members' homes for visits with the goal of identifying "gaps in care." The Company offers rewards and has provided members with incentives such as gift cards to encourage participation in the program.

101.    HouseCalls visits are strictly limited in scope, allowing nurse practitioners to record new diagnoses but preventing them from providing direct medical treatment or care, writing prescriptions, ordering diagnostic tests, or referring members to specialists for special attention. Indeed, the main task the practitioners accomplish is filling out a lengthy online questionnaire, including a checklist of possible diagnoses the practitioners can make.

102.    The Company encourages its nurse practitioners to participate in a set number of HouseCalls visits each day, linking the practitioner's compensation to the amount of in-home visits they make each week. The nurse practitioners are also evaluated on how effectively they are able to find new diagnoses, giving instructions to conduct unnecessary and otherwise unreliable tests that were known to generate false-positives during the visits. The practitioners were encouraged to identify high-value diagnoses that were otherwise not present in medical records, thereby allowing for a change in diagnosis codes to more lucrative ones.

103.    For example, the Company instructed its nurse practitioners to inflate the number of diagnoses reported on HouseCalls visits. The practitioners themselves used Company-issued laptops with a pre-loaded software that was set to maximize the number of diagnoses made on a visit, maximizing the payout received for that member. The software was not neutral, but rather suggested potential diagnoses based on medications the member took, pushing the nurse practitioners to make as many medical determinations as possible. The Company had designed the

software to ensure that the nurse practitioners followed a set path of diagnosis generation, inflating the risk scores for that member.

104.    According to an August 4, 2024, *Wall Street Journal* article, the HouseCalls software was designed to encourage a diagnosis of secondary hyperaldosteronism, an otherwise rarely diagnosed condition.[4] The software suggested this despite the fact that HouseCalls nurse practitioners could not confirm the diagnosis with lab tests, leading to the Company receiving a $450 million payout for members with secondary hyperaldosteronism from 2019 to 2021, over ten times what all other Medicare Advantage plans received for that diagnosis combined.[5] In another example, on March 22, 2023, *The New York Times* noted that "some Medicare Advantage plans from UnitedHealth reported that half of their patients had vascular disease, in contrast with just 14 percent in the basic government program."[6]

105.    Earlier, on June 5, 2022, the *Washington Post* reported that a primary care physician who regularly received in-home risk assessments for his patients noted that new patient codes were added to reports documenting conditions he either already knew about or considered irrelevant.[7] For instance:

> [The doctor] shared a copy of one assessment, with identifying information of the patient removed, that was sent to him by HouseCalls in April. He was already treating the patient, a man in his 70s, for diabetes. But the health risk assessment, in a section called "new diagnoses," had added a different code, diabetes with complications. The new diagnoses section also listed a personal history of a type of

---

[4] Anna W. Mathews, et al., *The One-Hour Nurse Visits That Let Insurers Collect $15 Billion From Medicare*, WALL ST. J. (Aug. 4, 2024)*, https://www.wsj.com/health/healthcare/medicare-extra-payments-home-visits-diagnosis-057dca8b?reflink=desktopwebshare_permalink.*
[5] *Id.*
[6] Reed Abelson and Margot Sanger-Katz, *Biden Plan to Cut Billions in Medicare Fraud Ignites Lobbying Frenzy*, N.Y. TIMES (Mar. 22, 2023), https://www.nytimes.com/2023/03/22/health/medicare-insurance-fraud.html.
[7] Christopher Rowland, *Beat Cancer? Your Medicare Advantage Plan Might Still Be Billing For It*, WASH. POST (June 5, 2022), https://www.washingtonpost.com/business/2022/06/05/medicare-advantage-records-fraud/.

skin cancer. Dardick said a precancerous growth was removed from the patient's skin nine years ago and is no longer being treated.[8]

106.    The nurse practitioners also received pressure from the Company's internal quality assurance team, who reviewed the questionnaires to ensure that HouseCalls was maximizing all possible high-value diagnosis codes. Through this review process, the reviewers would put pressure the nurse practitioners to identify and add diagnosis codes that the practitioners had not previously identified. Essentially, the nurse practitioners were pressured to link reported symptoms with previously diagnosed chronic conditions.

107.    In addition, HouseCalls nurse practitioners were instructed to utilize devices called QuantaFlo in order to diagnose peripheral artery disease. This instruction was issued despite the fact that the United States Food and Drug Administration ("FDA") had not approved it as a stand-alone diagnostic device, and guidelines were issued that recommended against the widespread use of QuantaFlo for screening of peripheral artery disease.

108.    The August 4, 2024, *Wall Street Journal* article reported that the Company diagnosed peripheral artery disease 568,000 times after in-home visits between 2019 and 2021, resulting in the Company receiving $1.4 billion in payments while all other Medicare Advantage plans received $446 million from the same diagnosis combined.[9]

109.    Beyond HouseCalls, the Individual Defendants utilized chart reviews and provider pressure tactics to enforce the Upcoding Misconduct. For example, Company risk-adjustment coders who worked for Optum were utilized to review the charts of Medicare Advantage members and seek out chronic conditions that could be linked to potential complications if left unsupported. These coders were told to find information that would allow the Company to increase the

---

[8] *Id.*
[9] Mathews, et al., *The One-Hour Nurse Visits That Let Insurers Collect $15 Billion From Medicare, supra* note 4.

member's risk-adjustment scores.

110.    The risk-adjustment coders were also instructed to link chronic conditions to known complications even where the connection was not medically indicated. These coders were evaluated based on how much upcoding they performed, with expectations to find the highest value diagnosis possible.

111.    The coders were also instructed to "lead" providers, which is to coach the providers in finding high-value diagnoses without regard for medical necessity. In 2023, much of the Company's risk-adjustment coding was outsourced to offshore entities, mainly based in India.

112.    In September 2021, the Office of the Inspector General of the Department of Health and Human Services ("OIG") published a report based on its evaluation of payments made by CMS in 2017 based on chart reviews and health risk assessments.[10] The report found that the Company stood out in its use of chart reviews and health risk assessments to increase its risk-adjusted payments.[11] Specifically, the Company received 40% of all risk-adjusted payments made by CMS based on chart reviews and health risk assessments in 2017.[12] This was despite the fact that the Company only enrolled approximately 22% of all Medicare Advantage plan members.[13] Similarly, the Company received 58% of all payments made by CMS based on health risk assessments that same year, almost all of which took place in members' homes.[14] In total, the Company received two thirds of all payments made by CMS in 2017 based on diagnoses reported

---

[10] Suzanne Murrin, *Some Medicare Advantage Companies Leveraged Chart Reviews and Health Risk Assessments To Disproportionately Drive Payments,* U.S. Dep't Health & Human Servs. OIG (Sept. 2021), *https://oig.hhs.gov/documents/evaluation/2794/OEI -03-17-00474-Complete%20Report.pdf.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*

from only in-home health risk assessments and no other service records.[15]

113.    In January 2023, *Kaiser Health News* reported on the most recently available audits of the Company, which covered the years 2011 to 2013.[16] Auditors sampled 3,015 seniors to confirm whether they "had the medical conditions the government paid Medicare Advantage plans to treat."[17] More than 50% of the audits performed revealed overpayments to Medicare Advantage health plans for the seniors.[18]

***Optum's Acquisition of Change Leads to Concerns About the Company's Data Security***

114.    On January 6, 2021, the Company announced Optum's intent to acquire Change. Change was a healthcare technology company that operated as the largest EDI clearinghouse, acting as the "pipes" of the industry by processing insurance claims and moving data between entities. In its estimate, the Company represented to investors that over half of American insurance claims either "pass[ed] through (or touch[ed])" Change's systems.

115.    The data that flowed through Change covers the entire lifecycle of a claim, including both pre- and post-adjudication stages. The pre-adjudication data covers information pertaining to the provider, the patient, the employer group, the location of care, the diagnosis, the services and procedures rendered, and the billed amounts. Post-adjudication data includes details about the provider-payer contract, payer's claims edits, the medical policy and benefit design, the final amount paid, and adjudication decisions.

116.    At the time it was acquired, Change processed over 15 billion transactions per year, totaling over $1.5 trillion in adjudicated value. As such, Change had access to data relating to

---

[15] *Id.*

[16] Fred Schulte, *Did Your Health Plan Rip Off Medicare?*, KFF HEALTH NEWS (Jan. 27, 2023), https://kffhealthnews.org/news/article/medicare-advantage-audits-investigation-cms-overpayment-recoup-billions/.

[17] *Id.*

[18] *Id.*

approximately half of all commercial medical claims in the United States.

117. Through the Change acquisition, Optum gained access to Change's vast amount of provider financial and clinical data, including customer sensitive information ("CSI").

118. As a result, the acquisition immediately came under scrutiny. For example, on March 17, 2021, the American Hospital Association sent a letter expressing concern regarding the competition for healthcare IT services.

119. On February 24, 2022, the DOJ and the attorneys general for Minnesota and New York initiated the First DOJ Action, attempting to block the acquisition. The DOJ's complaint alleged that the acquisition afforded the Company unrivaled access to information on nearly every health insurer, including health data on almost every single American citizen.

120. The Company countered the DOJ allegations by emphasizing the strength of its firewalls to safeguard customer data and CSI while also addressing antitrust concerns.

121. The Company claimed to have "operationalized its firewall policy through robust technological systems that prevent employees of one UnitedHealth business unit from accessing data housed within another UnitedHealth business unit."

122. After a trial, on September 19, 2022, Judge Carl Nichols of the U.S. District Court for the District of Columbia ruled in favor of the Company, having been persuaded by the Company's supposed history of maintaining data firewalls and policies prohibiting anti-competitive behavior. *See United States v. UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118 (D.D.C. 2022).

123. Despite Judge Nichols' ruling, Optum retained unrestricted access to customer data, including CSI, within its business applications. Specifically, Optum and its subsidiaries operated without role-based security systems or firewalls. The absence of role-based security meant there

were no safeguards to restrict data access based on user roles or permissions. Consequently, once Optum granted a user access request, there were no mechanisms to limit the scope of data the user could view.

124.    This was particularly alarming because Change's external customers included competitors of Optum's internal businesses. Specifically, for every product Change offers, an Optum intracompany business competes with one of Change's customers. Consequently, the absence of firewalls between intracompany units heightened the risk of sensitive information exposure and amplified the potential for anti-competitive conduct.

125.    The Company finished integrating Change's operations by October 2022, and the Integration Management Office learned at that time that there was a lack of internal firewalls and other integration risks. The Integration Management Office is responsible for reporting issues to executive leadership, including the Individual Defendants.

### The Company's Additional Anti-Competitive Misconduct Leads to a Second DOJ Investigation

126.    During the Relevant Period, the Company leveraged its dominant market share to engage in Anti-Competitive Misconduct, aiming to strengthen its grip on healthcare services, suppress competition, and increase revenue.

127.    For instance, through Optum, the Company dominated the primary care provider market, particularly in regions with robust competition. A notable case involved Optum contracting with hospitals that owned primary care practices competing directly with Optum. Optum pressured these hospitals with threats of contract termination unless they agreed to newer, less competitive terms that forced the hospitals to exit the primary care provider market.

128.    The demanded terms included granting Optum "first and last right of refusal" if these hospitals put their primary care practices up for sale, not poaching Optum's doctors, and that

Optum would pay less for hospital services. Optum would cut ties with the hospitals and then steer its Medicare Advantage plan members to other facilities if the hospital failed to capitulate.

129.    Similarly, Optum would attempt to prevent its doctors from leaving Optum-owned practices by using unlawful contract restrictions, as well as threatening doctors with legal action should they move.

130.    After doctors departed from Optum, the company instructed employees to deceive patients by withholding information about the doctors' exits. Instead of disclosing that the doctors had moved, employees were directed to lie by telling patients that the doctors had retired or were on vacation.

131.    Similarly, UnitedHealthcare pressured its in-network physicians and facilities to stop recommending providers who operated outside of the UnitedHealthcare network. This was accomplished through offering financial incentives to in-network providers and refer patients only to in-network providers.

132.    As a result of the Upcoding Misconduct and the Anti-Competitive Misconduct, on October 10, 2023, the Company received notice that the DOJ had launched the DOJ Investigation into the Company. While news of the investigation was known within the Company, investors were left unaware of both the investigation and the underlying misconduct.

**False and Misleading Statements**

***September 22, 2021 Wall Street Journal Article***

133.    On September 22, 2021, *The Wall Street Journal* published an article titled "Most of $9.2 Billion in Questionable Medicare Payments Went to 20 Insurers, Investigators Say."[19]

---

[19] Anna Wilde Mathews, *Most of $9.2 Billion in Questionable Medicare Payments Went to 20 Insurers, Investigators Say,* WALL ST. J. (Sept. 22, 2021), *https://www.wsj.com/health/healthcare/most-of-9-2-billion-in-questionable-medicare-payments-*

134.    The article reported on the September 2021 OIG report, which revealed that 20 Medicare insurers received approximately half of the $9.2 billion pool of suspect Medicare payments alone.[20] The article claimed that:

> Among the 20 companies flagged in the report, the investigators found that one received approximately 40% of the questionable payments, or $3.7 billion, while enrolling only 22% of Medicare Advantage customers. The [OIG] report didn't name the company. Federal data compiled by analysts at BMO Capital Markets shows that enrollment share closely matched that of industry giant UnitedHealth Group Inc.'s UnitedHealthcare during the period covered in the report.[21]

135.    The article also quoted the Company, which denied any wrongdoing, stating that "*UnitedHealthcare's in-home clinical care programs provide significant benefits to seniors and for years have been valuable offerings to ensure our members continue to receive cost-effective, appropriate care. Our Medicare Advantage risk-adjustment program is transparent and compliant with CMS rules.*" [22]

### October 14, 2021 Earnings Call

136.    On October 14, 2021, the Company hosted an earnings call with investors and analysts to discuss the Company's financial results for the third quarter of 2021 (the "Q3 2021 Earnings Call").

137.    During the question-and-answer portion of the Q3 2021 Earnings Call, the Individual Defendants received several questions pertaining to the impact COVID-19 has had on the Medicare Advantage risk-adjustments as well as the Company's in-home wellness visits. Thompson responded to these questions by stating "*[W]e are encouraged by the encounters with*

---

*went-to-20-insurers-federal-investigators-say-11632303001?gaa_at=eafs&gaa_n=ASWzDAgcJQKSaYWcd2Kb5JVmEwt8DAIK0SS8IRznO4f EiD7PxGlipp68qrB12OZfaYA%3D&gaa_ts=6841c9df&gaa_sig=qE3DSIO3JCIiML43hKZ6sAp aiIt1QlAvksIp2T1Jq0LxB-okhZT6jj8P4OF45PSwvYWWtAmA_d2LVhEkishIUQ%3D%3D*.

[20] *Id.*

[21] *Id.*

[22] *Id.* All emphasis is added unless otherwise noted.

*the physicians, the primary care visits and annual wellness visits as well as in-home clinical visits. So those have been encouraging. So I certainly expect less of a headwind in 2022 due to those encounters, certainly getting traction certainly compared to 2021.*"

138.    Later in the question-and-answer portion of the Q3 2021 Earnings Call, a Barclay's analyst asked about the September 22, 2021 *Wall Street Journal* article, to which the Company's Chief Operating Officer ("COO") Dirk McMahon responded:

> *Barclay's Analyst*: So you touched on the topic of Medicare risk adjuster payments earlier. This was also a little bit more topical about a month ago with *The Wall Street Journal* putting a spotlight on it. So I guess I'm just curious if you have any updated high-level thoughts on [Medicare risk-adjustment] payments conceptually for the managed care industry overall. And do you see any potential reform of [Medicare risk-adjustment] near term? Or do you expect status quo going forward?

> *Dirk McMahon*: And when we think about the risk adjustment model in the payment system. The model has been critical to providing broad and equitable access to [Medicare Advantage]. ***Risk adjustment levels of playing field and ensures that there's no disincentive to care for the most vulnerable. So we really feel that it's an essential part of encouraging the right incentives in the program***, and think that it's something to build on and broadly support that we need to think about how to build on these positive elements and aspects of the program for which this is one of them.

### October 19, 2021 Minnesota Star Tribune Article

139.    On October 19, 2021, the *Minnesota Star Tribune* published an article titled "Report says UnitedHealth Group was top recipient of questionable Medicare payments."[23]

140.    The article also reported on the September 2021 OIG report, revealing that, pursuant to government documents the *Minnesota Star Tribune* received, UnitedHealth was identified in the report as having been the company that "covered 22% of all [members] enrolled in the health plans [reviewed by the OIG] at the time, yet received a disproportionately high $3.7

---

[23] Christopher Snowbeck, *Report Says UnitedHealth Group Was Top Recipient of Questionable Medicare Payments*, MINN. STAR TRIBUNE (Oct. 19, 2021), https://www.startribune.com/report-says-unitedhealth-group-was-top-recipient-of-questionable-medicare-payments/600108138.

billion, or 40% of the total payments" in 2017.[24] The article further revealed that the OIG "report

found UnitedHealth Group received 58% of all payments" from in-home health risk assessments.[25]

The article also revealed that "UnitedHealth Group accounted for two-thirds of all risk-adjusted

payments resulting from diagnoses reported only on in-home [assessments] and no other service

record."[26]

141.    The Company continued to deny any wrongdoing, stating that the OIG report was

"*based on old data and is inaccurate and misleading – a disservice to seniors and an attack on*

*the [federal government's] payment system*," and that "*[i]n-home clinical care programs and*

*chart reviews are needed for appropriate senior care and payment, . . . UnitedHealthcare's status*

*as an early clinical home provider is not only appropriate, it's best practice*."

*November 3, 2021 Form 10-Q*

142.    On November 3, 2021, the Company filed its quarterly report on Form 10-Q with

the SEC for the third quarter of 2021 (the "Q3 2021 10-Q"). The Q3 2021 10-Q was signed by

Defendant Witty and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the

Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Witty attesting

to the accuracy of the Q3 2021 10-Q and that the Q3 2021 10-Q "does not contain any untrue

statement of a material fact or omit to state a material fact necessary to make the statements made,

in light of the circumstances under which such statements were made, not misleading with respect

to the period covered by this report."

143.    Regarding the Company's increases in revenue, the Q3 2021 10-Q stated that

"*UnitedHealthcare's revenue increased due to growth in the number of individuals served*

---

[24] *Id.*

[25] *Id.*

[26] *Id.*

*through Medicare Advantage and Medicaid, including a greater mix of people with higher*

*acuity needs . . . .*"

*November 30, 2021 Investor Conference*

144.    On November 30, 2021, the Company hosted its annual investor conference (the

"2021 Investor Conference"). During the 2021 Investor Conference, Defendant Witty presented

on HouseCalls and its focus on purportedly improving the healthcare experience for Medicare

Advantage members, stating:

> *Another is through [HouseCalls], a true collaboration between Optum and UnitedHealthcare, where our clinicians help seniors in Medicare Advantage programs manage their chronic disease, close gaps in care and stay healthy and out of the hospital. Our teams not only look after our members' medical needs, they help with any number of life challenges like keeping healthy food in the fridge or find an assistance with a utility bill.*

*January 19, 2022 Earnings Call*

145.    On January 19, 2022, the Company hosted an earnings call with investors and

analysts to discuss the Company's fourth quarter and year-end financial results for 2021 (the "FY

2021 Earnings Call").

146.    During the FY 2021 Earnings Call, Defendant Witty stated the following regarding

the Company's HouseCalls program:

> [O]ne of the things that I think we really are pleased about is the way in which OptumCare has developed a whole set of capabilities to deliver really enhanced focus on [Medicare Advantage] patients. Obviously, these patients have a high medical need very often. They need high touch. I've been super impressed with the development, not just in the clinic, *but also through the at home programs, where we're able to continue to make sure folks are looked after properly*.

*February 15, 2022 Form 10-K*

147.    On February 15, 2022, the Company filed its annual report on Form 10-K with the

SEC for 2021 (the "2021 10-K"). The 2021 10-K was signed by Defendant Witty, signed by

Defendants Flynn, Garcia, Hemsley, Hooper, McNabb, Montgomery Rice, and Noseworthy

through an Attorney-In-Fact, and attached SOX certifications signed by Witty attesting to the accuracy of the 2021 10-K and that the 2021 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

148.    Regarding "UnitedHealthcare Medicare & Retirement," the 2021 10-K stated:

> Medicare Advantage. . . . Under the Medicare Advantage program, UnitedHealthcare Medicare & Retirement provides health insurance coverage in exchange for a fixed monthly premium per member from CMS plus, in some cases, monthly consumer premiums. ***Premium amounts received from CMS vary based on the geographic areas in which individuals reside; demographic factors such as age, gender and institutionalized status; and the health status of the individual***.

149.    In the same section, regarding the Company's HouseCalls program, the 2021 10-K stated:

> UnitedHealthcare Medicare & Retirement's senior-focused care management model operates at a medical cost level below traditional Medicare, while helping seniors live healthier lives. We have continued to enhance our offerings, focusing on more digital and physical care resources in the home, expanding our concierge navigation services and enabling the home as a safe and effective setting of care. ***For example, through our HouseCalls program, nurse practitioners performed more than 2.1 million clinical preventive home care visits in 2021 to address unmet care opportunities and close gaps in care***.

150.    Regarding the receipt of premium revenues from CMS, the 2021 10-K stated that "***Premium revenues from CMS represented 36% of UnitedHealth Group's total consolidated revenues for the year ended December 31, 2021, most of which were generated by UnitedHealthcare Medicare & Retirement***."

151.    The Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public in ¶¶ 133-150 that failed to disclose, *inter alia*, that: (1) the Company and the Individual Defendants were engaging in the Anti-Competitive Misconduct and the Upcoding Misconduct; and (2) through these schemes, the

Individual Defendants opened the Company to a significant risk of litigation once the scheme was inevitably uncovered. As a result of the foregoing, UnitedHealth's public statements were materially false and misleading at all relevant times.

### February 24, 2022 Optum Fact Sheet

152.    On February 24, 2022, Optum posted a "fact sheet" about the Change acquisition to its website. The "fact sheet" claimed that the "***theories at the core of the [DOJ's] case are completely without merit***."

153.    The fact sheet also highlighted Optum's firewalls, stating that "***Our track record of safeguarding our customers' proprietary information speaks for itself. We have best-in-class firewalls and compliance programs that maintain the integrity of our customers' data and information, and prevent unauthorized access and misuse. Combining with Change Healthcare alters none of those fundamentals***."

### March 11, 2022 Answer

154.    On March 11, 2022, the Company filed its answer in the First DOJ Action. In its answer, the Individual Defendants highlighted how the Company "***agreed to make binding commitments to its customers and the Government***" to "***maintain its robust firewall processes – and extend them to Change's business – to protect sensitive customer data and provide information to customers to allow them to verify those firewall processes***."

155.    The answer also states that "***OptumInsight imposes strict limitations on the use or disclosure of external customer data . . . .***"

### March 17, 2022 Benefits Document

156.    On March 17, 2022, the Company posted a document to its website addressing the First DOJ Action, titled "Benefits of Combination with Change Healthcare."

-44-

157.    The document highlighted that "***Optum will maintain robust firewall processes and extend them to Change Healthcare's business – to protect sensitive customer data and provide information to customers to allow them to verify those firewall processes***."

158.    In discussing the commitment to data protection, the document also stated that Optum "***invests extraordinary time, money, and resources into safeguarding [customer sensitive] information and keeping it walled off from UnitedHealthcare***" and that "***UnitedHealth Group's existing firewalls and datasecurity policies prohibit employees from improperly sharing external-customer [information].***"

159.    The Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public in ¶¶ 152-158 that failed to disclose, *inter alia*, that: (1) the Company and the Individual Defendants were engaging in the Anti-Competitive Misconduct; (2) the Company overstated the capabilities of Optum's firewalls while actively concealing Optum's ability to circumvent those same firewalls; and (3) this too opened the Company up to a significant risk of investigation and litigation. As a result of the foregoing, UnitedHealth's public statements were materially false and misleading at all relevant times.

***April 14, 2022 Earnings Call***

160.    On April 14, 2022, the Company hosted an earnings call with investors and analysts to discuss the Company's financial results for the first quarter of 2022 (the "Q1 2022 Earnings Call").

161.    During the Q1 2022 Earnings Call, the CEO of UnitedHealthcare's Medicare & Retirement division, Tim Noel, stated the following regarding HouseCalls:

***In-home testing is certainly a huge area of focus for us. . . . [M]ore recently, we've really been focused on reaching out to people that we know to be***

*underdiagnosed for conditions like hep C and diabetes. And in doing this, we've reached out over the last year to about 1 million members who we suspect to be underdiagnosed and offering in-home testing solutions that are then delivered by our HouseCalls partners over at Optum. These completion rates have been really promising, 35% last year, and we'll continue to evaluate expanding this program. That will do a really nice job of helping us understand where conditions are underdiagnosed and can be better treated.*

**May 4, 2022 Form 10-Q**

162.    On May 4, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the first quarter of 2022 (the "Q1 2022 10-Q"). The Q1 2022 10-Q was signed by Defendant Witty and attached SOX certifications signed by Witty attesting to the accuracy of the Q1 2022 10-Q and that the Q1 2022 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

163.    Regarding the Company's increases in revenue, the Q1 2022 10-Q uses the same language as the Q3 2021 10-Q. *Supra* ¶ 143.

**May 10, 2022 Bank of America Conference Call**

164.    On May 10, 2022, the Company participated in a conference call hosted by Bank of America regarding the healthcare industry. During the call, the CEO of Optum RX, Inc. stated the following regarding the Company's HouseCall's program's value:

*So another great example is even go back beyond and you think about the beginnings of our home and community base, think about HouseCalls, which we've talked about for years. I remember when HouseCalls was doing a couple of hundred thousand annual visits a year. Today, it is really the backbone of a home and community-based program that brings more value to the system, helps consumers, service people in their home, puts together capabilities that will keep driving value, and we'll continue to grow and drive value to all of our payers and clients.*

165.    The Individual Defendants willfully or recklessly made and/or caused the Company

to make false and misleading statements to the investing public in ¶¶ 160-164 that failed to disclose, *inter alia*, that: (1) the Company and the Individual Defendants were engaging in the Anti-Competitive Misconduct and the Upcoding Misconduct; and (2) through these schemes, the Individual Defendants opened the Company to a significant risk of litigation once the scheme was inevitably uncovered. As a result of the foregoing, UnitedHealth's public statements were materially false and misleading at all relevant times.

### *May 2022 Firewall Policy*

166.    In May 2022, the Company initiated a new firewall policy related to the Change acquisition. Regarding CSI, the new policy stated:

- "***The disclosure of External Customer CSI to UHG business units that are competitors of such External Customers is strictly prohibited***";

- "***The use of External Customer CSI to benefit UHG business units that are competitors of such External Customers is strictly prohibited***";

- "***UHG employees may not access External Customer CSI unless such access is necessary to perform their job responsibilities***"; and

- "***External Customer CSI shall be logically separated from other UHG business unit data within Electronic Data Sites. No employees of other UHG business units that are competitors of an External Customer shall have access to the location where External Customer CSI is stored within such Electronic Data Sites.***"

### *June 14, 2022 Sustainability Report*

167.    On June 14, 2022, the Company published its Sustainability Report for 2021 (the "2021 Sustainability Report").

168.    In discussing data privacy and cybersecurity, the 2021 Sustainability Report stated that the Company was "focused" on "maintaining data privacy and cybersecurity," noting the Company's "obligation" to "protect the information of all those we serve." The 2021 Sustainability Report also highlighted how the Company was "required to safeguard personal information

reasonably and appropriately" and that the "[p]rimary tools used to fulfill these obligations are cybersecurity and data privacy programs."

169.    The 2021 Sustainability Report further noted that the Company "***manages a robust Information Security Risk Management and Privacy Program that improves its ability to make risk-informed decisions by conducting systematic and structured reviews of information security risks.***" Afterwards, the results of these audits are "communicated to executive leadership and presented to the Audit and Finance Committee of the Board of Directors quarterly."

170.    Regarding the Company's data protection policies, the 2021 Sustainability Report stated that the Company's "***data protection policy applies to all lines of business and subsidiaries***" and that its "***Code of Conduct outlines our commitment to protecting the information entrusted to us. Supported by a comprehensive set of principles, our policies and programs describe appropriate uses of data and the safeguards that protect the confidentiality and integrity of our systems***." The policies include "[e]nterprise information security policies," "[p]rivacy and data protection policies," and "[a]n incident management program that encompasses cybersecurity, privacy and compliance obligations."

171.    The Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public in ¶¶ 166-170 that failed to disclose, *inter alia*, that: (1) the Company overstated the capabilities of Optum's firewalls while actively concealing Optum's ability to circumvent those same firewalls; and (2) this opened the Company up to a significant risk of investigation and litigation. As a result of the foregoing, UnitedHealth's public statements were materially false and misleading at all relevant times.

### *July 15, 2022 Earnings Call*

172.    On July 15, 2022, the Company hosted an earnings call with investors and analysts

to discuss the Company's financial results for the second quarter of 2022 (the "Q2 2022 Earnings Call").

173.    During the Q2 2022 Earnings Call, Defendant Witty stated the following regarding the benefits HouseCalls patients receive: "***And as you know, we've got a long history in this in areas like house calls, which have delivered amazing health assessment and preventive direction to millions of people, and this is another big step for us to extend***."

174.    Similarly, John Rex, the Company's Chief Financial Officer ("CFO") stated that the HouseCalls annual wellness assessments for Medicare members was "***very important for us in getting them the care they need" and "[w]e got to make sure people are getting the care that they need. We've seen the greatest response really in our senior populations. I think some of that is our ability to get into their homes to influence that care and to get them into that***."

175.    The Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public in ¶¶ 172-174 that they failed to disclose, *inter alia*, that: (1) the Company and the Individual Defendants were engaging in the Anti-Competitive Misconduct and the Upcoding Misconduct; and (2) through these schemes, the Individual Defendants opened the Company to a significant risk of litigation once the scheme was inevitably uncovered. As a result of the foregoing, UnitedHealth's public statements were materially false and misleading at all relevant times.

***July 22, 2022 Amended Pretrial Brief***

176.    On July 22, 2022, the Company filed its amended pretrial brief in the First DOJ Action. The pretrial brief stated that "***UHG has an 'advanced and sophisticated technology architecture and infrastructure' of internal firewalls that prevent the sharing of competitively sensitive information across business units.***"

-49-

177.    The Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public in ¶ 176 that failed to disclose, *inter alia*, that: (1) the Company overstated the capabilities of Optum's firewalls while actively concealing Optum's ability to circumvent those same firewalls; and (2) this opened the Company up to a significant risk of investigation and litigation. As a result of the foregoing, UnitedHealth's public statements were materially false and misleading at all relevant times.

### *August 3, 2022 Form 10-Q*

178.    On August 3, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the second quarter of 2022 (the "Q2 2022 10-Q"). The Q2 2022 10-Q was signed by Defendant Witty and attached SOX certifications signed by Witty attesting to the accuracy of the Q2 2022 10-Q and that the Q2 2022 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

179.    Regarding the Company's increases in revenue, the Q2 2022 10-Q uses the same language as the Q3 2021 10-Q. *Supra* ¶ 143.

180.    The Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public in ¶¶ 178-179 that failed to disclose, *inter alia*, that: (1) the Company and the Individual Defendants were engaging in the Anti-Competitive Misconduct and the Upcoding Misconduct; and (2) through these schemes, the Individual Defendants opened the Company to a significant risk of litigation once the scheme was inevitably uncovered. As a result of the foregoing, UnitedHealth's public statements were materially false and misleading at all relevant times.

### September 7, 2022 Post-Trial Brief

181.    On September 7, 2022, the Company filed its post-trial brief in the First DOJ Action. The post-trial brief again assured that the Company had "***operationalized its firewall policy through 'robust' technological systems that prevent employees of one UHG business unit from accessing data housed within another UHG business unit.***"

### September 7, 2022 Proposed Findings of Fact

182.    That same day, the Company filed its Proposed Findings of Fact in the First DOJ Action. The Proposed Findings of Fact stated that:

> ***For years, UHG has maintained robust firewall and data security policies specifically designed to make sure customers' potentially sensitive information is protected and not misused in any way. UHG commits to apply these same firewall and data security policies to customer data held by Change on behalf of Change's EDI customers, and to uphold all contractual rights of Change's customers to audit the protection and security of their data***.

183.    The Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public in ¶¶ 181-182 that failed to disclose, *inter alia*, that: (1) the Company overstated the capabilities of Optum's firewalls while actively concealing Optum's ability to circumvent those same firewalls; and (2) this opened the Company up to a significant risk of investigation and litigation. As a result of the foregoing, UnitedHealth's public statements were materially false and misleading at all relevant times.

### November 2, 2022 Form 10-Q

184.    On November 2, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the third quarter of 2022 (the "Q3 2022 10-Q"). The Q3 2022 10-Q was signed by Defendant Witty and attached SOX certifications signed by Witty attesting to the accuracy of the Q3 2022 10-Q and that the Q3 2022 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances

under which such statements were made, not misleading with respect to the period covered by this report."

185.    Regarding the Company's increases in revenue, the Q3 2022 10-Q uses the same language as the Q3 2021 10-Q. *Supra* ¶ 143.

186.    The Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public in ¶¶ 184-185 that failed to disclose, *inter alia*, that: (1) the Company and the Individual Defendants were engaging in the Anti-Competitive Misconduct and the Upcoding Misconduct; and (2) through these schemes, the Individual Defendants opened the Company to a significant risk of litigation once the scheme was inevitably uncovered. As a result of the foregoing, UnitedHealth's public statements were materially false and misleading at all relevant times.

### *November 29, 2022 Investor Conference*

187.    On November 29, 2022, the Company hosted its annual investor conference (the "2022 Investor Conference").

188.    The Conference Book for the 2022 Investor Conference touted the Company's "***long-established firewalls and strong legal, reputational, ethical and financial incentives to protect patient and customer information***."

189.    The Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public in ¶ 188 that failed to disclose, *inter alia*, that: (1) the Company overstated the capabilities of Optum's firewalls while actively concealing Optum's ability to circumvent those same firewalls; and (2) this opened the Company up to a significant risk of investigation and litigation. As a result of the foregoing, UnitedHealth's public statements were materially false and misleading at all relevant times.

190.     Also during the 2022 Investor Conference, the UnitedHealthcare's Senior Vice President of Medicare Advantage Product & Experience division Robert Hunter stated that "House[Calls] has been the centerpiece of our home care model for government programs for years," before adding that:

> *We expect to complete 2.2 million house calls this year, bringing personalized care into the home to address both immediate and preventive medical care needs in addition to social needs, including access to healthy food, safe housing, transportation and medical appointments and more. We have been testing people for underdiagnosed conditions such as diabetes, prediabetes, hep C and colon cancer. And what we found is nearly 1 out of every 4 people we screened had a condition, they didn't realize they had and the hep C positivity rates for dual special needs members are nearly double the national average.*

### *January 13, 2023 Earnings Call*

191.     On January 13, 2023, the Company hosted an earnings call with investors and analysts to discuss the Company's fourth quarter and year-end financial results for 2022 (the "FY 2022 Earnings Call").

192.     During the FY 2022 Earnings Call, the Company's COO Dirk McMahon stated the following regarding HouseCalls:

> *[W]e continue to expand the range of clinical services we provide via our HouseCalls initiative. In 2023, we will increase the types of vaccinations offered, expand testing services and deploy even more real-time resources to address social determinants of health. Seniors place high value on being able to get care in their home.*

### *February 24, 2023 Form 10-K*

193.     On February 24, 2023, the Company filed its annual report on Form 10-K with the SEC for 2022 (the "2022 10-K"). The 2022 10-K was signed by Defendant Witty, signed by Defendants Flynn, Garcia, Gil, Hemsley, Hooper, McNabb, Montgomery Rice, and Noseworthy through an Attorney-In-Fact, and attached SOX certifications signed by Witty attesting to the accuracy of the 2022 10-K and that the 2022 10-K "does not contain any untrue statement of a

material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

194.    Regarding Medicare Advantage, the 2022 10-K uses the same language as the 2021 10-K. *Supra* ¶ 147.

195.    Under the heading "UnitedHealthcare Medicare & Retirement, the 2022 10-K stated the following regarding HouseCalls:

> We have continued to enhance our offerings, focusing on more digital and physical care resources in the home, expanding our concierge navigation services and enabling the home as a safe and effective setting of care. ***For example, through our HouseCalls program, nurse practitioners performed nearly 2.3 million clinical preventive home care visits in 2022 to address unmet care opportunities and close gaps in care.***

196.    Regarding premium revenues received from CMS, the 2022 10-K stated that "***Premium revenues from CMS represented 38% of UnitedHealth Group's total consolidated revenues for the year ended December 31, 2022, most of which were generated by UnitedHealthcare Medicare & Retirement***."

### April 14, 2023 Earnings Call

197.    On April 14, 2023, the Company hosted an earnings call with investors and analysts to discuss the financial results for the first quarter of 2023 (the "Q1 2023 Earnings Call").

198.    During the Q1 2023 Earnings Call, COO Dirk McMahon stated the following regarding HouseCalls: "***First, patient assessments, in-home clinical visits designed to identify care needs and help patients with other physical and social needs [sic]. This year, we expect to make more than 2.5 million visits to patients' homes and we continue to expand the scope of the clinical services offered in that setting***."

### May 3, 2023 Form 10-Q

199.    On May 3, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for the first quarter of 2023 (the "Q1 2023 10-Q"). The Q1 2023 10-Q was signed by Defendant Witty and attached SOX certifications signed by Witty attesting to the accuracy of the Q1 2023 10-Q and that the Q1 2023 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

200.    Regarding the Company's increases in revenue, the Q1 2023 10-Q uses the same language as the Q3 2021 10-Q. *Supra* ¶ 143.

201.    The Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public in ¶¶ 190-200 that failed to disclose, *inter alia*, that: (1) the Company and the Individual Defendants were engaging in the Anti-Competitive Misconduct and the Upcoding Misconduct; and (2) through these schemes, the Individual Defendants opened the Company to a significant risk of litigation once the scheme was inevitably uncovered. As a result of the foregoing, UnitedHealth's public statements were materially false and misleading at all relevant times.

### June 1, 2023 Bernstein Strategic Decisions Conference

202.    On June 1, 2023, Defendant Witty presented on behalf of the Company at the Bernstein Strategic Decisions Conference. During his presentation, Defendant Witty said of the Company's firewall requirements that the Company was focused on improving performance through "*exploiting the core synergy between Optum and UnitedHealthcare as much as we possibly can appropriately, of course, given the firewall requirements [that] are needed there*."

203.    The Individual Defendants willfully or recklessly made and/or caused the Company

to make false and misleading statements to the investing public in ¶ 202 that failed to disclose, *inter alia*, that: (1) the Company overstated the capabilities of Optum's firewalls while actively concealing Optum's ability to circumvent those same firewalls; and (2) this opened the Company up to a significant risk of investigation and litigation. As a result of the foregoing, UnitedHealth's public statements were materially false and misleading at all relevant times.

### July 14, 2023 Earnings Call

204.    On July 14, 2023, the Company hosted an earnings call with investors and analysts to discuss the financial results for the second quarter of 2023 (the "Q2 2023 Earnings Call").

205.    During the Q2 2023 Earnings Call, Defendant Witty stated the following regarding HouseCalls:

> Last month, researchers at Yale Medicine, working in collaboration with Optum, published a peer-reviewed study about in-home visits, an important element in our value-based care approach. ***The study found patients who received our in-home preventative wellness assessments compared with those who hadn't made fewer emergency department visits and spent fewer nights in hospitals across 4 common conditions: depression, hypertension, coronary artery disease and type 2 diabetes***. They also experienced reduced wait times for follow-up primary care.

### August 2, 2023 Form 10-Q

206.    On August 2, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for the second quarter of 2023 (the "Q2 2023 10-Q"). The Q2 2023 10-Q was signed by Defendant Witty and attached SOX certifications signed by Witty attesting to the accuracy of the Q2 2023 10-Q and that the Q2 2023 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

207.    Regarding the Company's increases in revenue, the Q2 2023 10-Q uses the same language as the Q3 2021 10-Q. *Supra* ¶ 143.

***November 6, 2023 Form 10-Q***

208.    On November 6, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for the third quarter of 2023 (the "Q3 2023 10-Q"). The Q3 2023 10-Q was signed by Defendant Witty and attached SOX certifications signed by Witty attesting to the accuracy of the Q3 2023 10-Q and that the Q3 2023 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

209.    Regarding the Company's increases in revenue, the Q3 2023 10-Q uses the same language as the Q3 2021 10-Q. *Supra* ¶ 143.

***November 29, 2023 Investor Conference***

210.    On November 29, 2023, the Company hosted its annual investor conference (the "2023 Investor Conference"). During the 2023 Investor Conference, UnitedHealthcare's Senior Vice President of Medicare Advantage Product & Experience division Robert Hunter stated the following regarding HouseCalls: "***This year, we will conduct more than 2.5 million in-home visits through our house calls program, completing approximately 200,000 tests for diabetes and hep C, which are consistently underdiagnosed conditions***," and "***[t]his year, we will screen nearly 3.8 million people, helping connect them to necessary resources with over 40% of those screenings occurring during a house calls visit***."

211.    The Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public in ¶¶ 204-210 that failed to disclose, *inter alia*, that: (1) the Company and the Individual Defendants were engaging in the Anti-Competitive Misconduct and the Upcoding Misconduct; and (2) through these schemes, the

Individual Defendants opened the Company to a significant risk of litigation once the scheme was inevitably uncovered. As a result of the foregoing, UnitedHealth's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

### February 22, 2024 Data Breach Announcement

212.   On February 22, 2024, the Company announced that Change had experienced a massive data breach as the result of a targeted attack by a ransomware group that took advantage of weaknesses in the Company's security. As a result, one third of all patient records within the United States were exposed as a result of them having been touched by Change.

213.   The hackers revealed that they took sensitive medical information for tens of millions of patients. The Company confirmed that among the information uncovered by the breach were diagnoses and medications, billing information such as credit card numbers, and personal information such as social security numbers.

214.   Once the hackers accessed the Company's system, they were able to operate undetected for nine days. Even then, the Company had no way to remove the threat, resulting in the Company disconnecting Change's systems to prevent the hackers from further accessing the data. In the following weeks and months, the Company restored systems to operation. However, the Company ultimately paid a $22 million ransom by April 22, 2024, at which point the Company claimed that "approximately 80% of Change functionality has been restored on the major platforms and products."

215.   The breach remains one of the largest attacks on the healthcare industry in American history.

### February 27, 2024 Wall Street Journal Article

216.    The truth fully emerged on February 27, 2024, when *The Wall Street Journal* published an article titled "U.S. Opens UnitedHealth Antitrust Probe, Investigators question industry officials who compete with the healthcare giant."[27] The article revealed the existence of the DOJ Investigation, stating:

> The Justice Department has launched an antitrust investigation into UnitedHealth, owner of the biggest U.S. health insurer, a leading manager of drug benefits and a sprawling network of doctor groups.
>
> The investigators have in recent weeks been interviewing healthcare-industry representatives in sectors where UnitedHealth competes, including doctor groups, according to people with knowledge of the meetings.
>
> During their interviews, investigators have asked about issues including certain relationships between the company's UnitedHealthcare insurance unit and its Optum health-services arm, which owns physician groups, among other assets.
>
> Investigators have asked about the possible effects of the company's doctor-group acquisitions on rivals and consumers, the people said.
>
> * * *
>
> The new Justice Department inquiry, reported earlier by the Examiner News, a news organization based in New York's Hudson Valley, is partly examining Optum's acquisitions of doctor groups and how the ownership of physician and health-plan units affects competition, according to the people with knowledge of the matter.
>
> Investigators have asked whether UnitedHealthcare favored Optum-owned groups in its contracting practices, potentially squeezing rival physicians out of certain types of attractive payment arrangements.
>
> Investigators have also explored whether Optum's ownership of healthcare providers could present challenges to health insurers that are rivals to UnitedHealthcare.
>
> In addition, the Justice Department officials are investigating Medicare billing issues, including the company's practices around documenting patients' illnesses.
>
> Payments to Medicare plans go up if patients have more health conditions, so aggressive documentation practices by doctors and other healthcare providers can be lucrative for insurers such as UnitedHealthcare.

---

[27] Weaver, *U.S. Opens UnitedHealth Antitrust Probe*, *supra* note 2.

And investigators have asked whether and how the tie-up between UnitedHealthcare and Optum medical groups might affect its compliance with federal rules that cap how much a health-insurance company retains from the premiums it collects from customers.

Under those rules, insurance plans are supposed to absorb no more than 15% or 20% of the premium for their administrative costs and profits, with the percentage varying depending on the type of plan. The rest is supposed to be spent on patient care, or rebated back to customers.

When the same company owns both the health insurer and the physicians and other healthcare providers who take care of patients, the combined firm may absorb far more than the capped amount, however.[28]

217.    On this news, the price of the Company's stock fell $27.04 per share, or approximately 5.1%, from a closing price of $525.32 per share on February 26, 2024, to close at $498.28 per share on February 28, 2024.

### Subsequent Developments Evidencing the Individual Defendants' Bad Faith and Malfeasance

218.    On March 18, 2024, *The Examiner News* published a recording from a January 26, 2024 UnitedHealth meeting in which Company executives coached nurses on how to "upcode" and increase Company profits.[29]

219.    On April 29, 2024, as a result of the stock sales noted above by Defendant Hemsley, among others, U.S. Senators Elizabeth Warren and Edward Markey of Massachusetts, along with 15 other lawmakers, sent a letter to the SEC requesting the SEC open an insider trading investigation into the Company. Due to the trades occurring during a DOJ investigation, when trades should otherwise have been prohibited, the letter stated that "these trades reveal a disturbing fact pattern." The letter further detailed the severe potential penalties that insiders, including

---

[28] *Id.*

[29] Adam Stone, *Whistleblower Releases Audio, Files Complaint: Cites Medical Billing Plot at Optum,* EXAMINER NEWS (Mar. 18, 2024), https://www.theexaminernews.com/whistleblower-releases-audio-files-complaint-cites-medical-billing-plot-at-optum/.

Defendant Hemsely, could face, including "civil penalties three times the amount of the profit gained or loss avoided and criminal penalties up to $5,000,000 and 20 years imprisonment."

220.    On May 1, 2024, Defendant Witty was called to testify before the House Energy and Commerce Committee as well as the Senate Finance Committee as a result of the February 22, 2024 data breach. Both committee meetings went beyond the scope of the data breach, focusing instead on the Company's business practices, with Senator Warren even calling the Company a "monopoly on steroids" that "will stop at nothing to get bigger, bigger, and bigger."

221.    On July 25, 2024 and August 7, 2024, *STAT News* published the first two parts of a seven-part series that showed "how UnitedHealth Group wields its unrivaled physician empire to boost its profits and expand its influence."[30] The reports detailed how the Company would encourage its physicians to upcode diagnoses in order to generate revenue.[31] The reports also covered the Company's use of QuantaFlo at HouseCalls visits.[32]

222.    On July 8, 2024 and August 4, 2024, *The Wall Street Journal* similarly issued a series of reports that detailed the Company's Upcoding Misconduct.[33] The reports showed how

---

[30] Bob Herman, et al., *How UnitedHealth Harnesses its Physician Empire to Squeeze Profits Out of Patients,* STAT NEWS (Jul. 25, 2024), https://www.statnews.com/2024/07/25/united-health-group-medicare-advantage-strategy-doctor-clinic-acquisitions/; Bob Herman, et al., *How UnitedHealth Turned a Questionable Artery-Screening Program Into a Gold Mine,* STAT NEWS (Aug. 7, 2024), https://www.statnews.com/2024/08/07/unitedhealth-peripheral-artery-disease-screening-program-medicare-advantage-gold-mine/.

[31] Herman, *How UnitedHealth Harnesses its Physician Empire*, *supra* note 30.

[32] Herman, *How UnitedHealth Turned a Questionable Artery-Screening*, *supra* note 30.

[33] Christopher Weaver, et al., *Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated,* WALL ST. J. (Jul. 8, 2024), https://www.wsj.com/health/healthcare/medicare-health-insurance-diagnosis-payments-b4d99a5d?gaa_at=eafs&gaa_n=ASWzDAjhDIDuOIKKS2nBzvqq6cSClS9Sr7Xtm0c9_qvSjP0kHd1-GZ1sPSV6tIN2e0I%3D&gaa_ts=6841da99&gaa_sig=MQbHcXzxiy8unNK8Wwe3dXwxgJNlbZfjKmw290aOYCjEsl6aXLdXEgrEt_1-Y6kxIdzf8c5dC--5fd2QoN4Ahg%3D%3D; Anna Wilde Mathews, et al., *The One-Hour Nurse Visits That Let Insurers Collect $15 Billion From Medicare,* WALL ST. J. (Aug. 4, 2024), https://www.wsj.com/health/healthcare/medicare-extra-payments-

the Company deliberately targeted certain diagnoses in an attempt to tack on profitable diagnosis codes.[34]

223.    In October 2024, OIG issued another report that detailed how the Company would take advantage of the Medicare Advantage system with the use of in-home health risk assessments and chart reviews through 2023. The report found that the Company received two-thirds of suspicious payments in 2023, despite only covering 28% of Medicare Advantage enrollees.[35]

224.    In February 2025, *The Wall Street Journal* reported a DOJ civil fraud investigation into UnitedHealth's Medicare billing practices.[36] This probe examined whether the Company submitted inflated diagnoses not supported by patient medical records, potentially involving $2 billion in questionable billings.[37]

225.    Also in February 2025, U.S. Senator Chuck Grassley launched an inquiry into UnitedHealth's Medicare billing practices, requesting detailed records of the Company's compliance program.[38]

226.    *The Wall Street Journal* first reported a separate criminal probe on May 14, 2025,

---

home-visits-diagnosis-057dca8b?gaa_at=eafs&gaa_n=ASWzDAgz6Hg1yvEuJi4ve4CZBLM-i2UtXFAT1INO_ihZKSBCx3i8fG_vzGt9D_Djy_s%3D&gaa_ts=6841db4b&gaa_sig=Po10MTr qxqavSFwLjuT50lIWz_X8ujQ2ky7YDw8cgsn7j3hJhqbg3affe9II1YL0g9spp3ci_1mVxbexIAIO AQ%3D%3D.

[34] Weaver, *Insurers Pocketed $50 Billion*; Mathews, *The One-Hour Nurse Visits*, *supra* note 4.

[35] U.S. Dep't Health & Human Servs. OIG, *Medicare Advantage: Questionable Use of Health Risk Assessments Continues To Drive Up Payments to Plans by Billions* (Oct. 2024), https://oig.hhs.gov/documents/evaluation/10028/ OEI-03-23-00380.pdf.

[36] Christopher Weaver and Anna Wilde Mathews, *DOJ Investigates Medicare Billing Practices at UnitedHealth*, Wall St. J. ( Feb. 21, 2025), https://www.wsj.com/health/healthcare/unitedhealth-medicare-doj-diagnosis-investigation-66b9f1db.

[37] *Id.*

[38] Christopher Weaver  and Anna Wilde Mathews, *Sen. Grassley Opens Inquiry Into UnitedHealth's Medicare Billing Practices*, Wall St. J. (Feb. 25, 2025), https://www.wsj.com/health/healthcare/sen-grassley-launches-inquiry-into-unitedhealth-groups-medicare-billing-practices-ad63a53c.

and the investigation has been ongoing for at least nine months prior to the report.[39] Following the report, UnitedHealth's stock plummeted, with shares dropping as much as 18% on May 15, 2025, and falling to a five-year low. This was the latest blow to the Company's market capitalization, which has shed over $300 billion since November 2024.

227.    The DOJ is also conducting a criminal investigation into UnitedHealth, focusing on potential Medicare fraud in its Medicare Advantage business. Active since at least summer 2024 and led by the DOJ's healthcare-fraud unit, the probe is examining whether the Company engaged in fraudulent practices, such as inflating patient diagnoses to obtain higher government reimbursements.

228.    On May 14, 2025, the Company announced in a Form 8-K filed with the SEC that on May 12, 2025, Defendant Witty had stepped down as CEO, effective immediately. That same day, the Board appointed Defendant Hemsley to take over as CEO. On May 21, 2025, the Company announced in a Form 8-K that the Board had accepted Defendant Witty's resignation from the Board on May 20, 2025.

229.    On May 21, 2025, *The Guardian* reported that the Company secretly paid nursing homes to reduce hospital transfers.[40] Notably:

> One term that UnitedHealth executives obsessed over was ***"admits per thousand"*** – APK for short. It was a measure of the rate that nursing homes sent their residents to the hospital. Under the "Premium Dividend" program, ***a low APK qualified a nursing home for the various bonus payments the insurer offered. A high APK meant that a nursing home received nothing.***
>
> ***APK drove everything***," said one former national UnitedHealth executive who

---

[39] Christopher Weaver and Anna Wilde Mathews, *UnitedHealth Group Is Under Criminal Investigation for Possible Medicare Fraud,* WALL ST. J. (May 15, 2025), https://www.wsj.com/us-news/unitedhealth-medicare-fraud-investigation-df80667f.

[40] George Joseph, *Revealed: UnitedHealth Secretly Paid Nursing Homes to Reduce Hospital Transfers*, GUARDIAN (May 21, 2025), https://www.theguardian.com/us-news/2025/may/21/unitedhealth-nursing-homes-payments-hospital-transfers.

worked on the initiative with nursing homes in more than two dozen states and spoke about the confidential contracts on the condition of anonymity. ***"You gain profitability by denying care, and when profitability suffers for the shareholders, that's when people get crazy and do things that are not appropriate.***

Two current and three former UnitedHealth nurse practitioners told the Guardian that UnitedHealth managers pressed nurse practitioners to ***persuade Medicare Advantage members to change their "code status" to DNR even when patients had clearly expressed a desire that all available treatments be used to keep them alive.***

*    *    *

The Guardian's reporting also found that the program offered nursing homes even ***larger sums for every senior enrolled in the insurer's offerings for long-term nursing home residents, which are called "Institutional Special Needs Plans".*** In some cases, ***these payments incentivized nursing homes to leak confidential resident records to UnitedHealth sales teams so they could directly solicit elderly residents and their families***, according to a whistleblower lawsuit currently being fought in federal court in Georgia as well as internal nursing home records and interviews with more than a dozen current and former nursing home employees and UnitedHealth salespeople.

[A nursing home resident] was experiencing forgetfulness and drooping on the right side of his face – "possible stroke symptoms", according to a confidential UnitedHealth incident log. But instead of sending the octogenarian straight to the hospital, the remote employee referred to a plan of care that called for bloodwork and giving [the nursing home resident] an aspirin – a course of action which one former UnitedHealth doctor said "doesn't make sense", given the risk of brain damage.

That's not useful when it might be a stroke," said the doctor, who spoke on the condition of anonymity to comment on Keep's confidential patient records that he reviewed at the request of the Guardian. "What they really need is a physical exam and an MRI of the brain, and it needs to be done expeditiously."

The incident log, which doesn't mention a hospital transfer, suggests that the UnitedHealth team didn't treat the case with the urgency that a possible stroke would require.[41]

230.    On this news, the price of the Company's stock fell $26.01 per share, or approximately 8%, from a closing price of $321.58 per share on May 20 to close at $295.57 per

---

[41] *Id.* All emphasis is added unless otherwise noted.

share on June 5, 2025.

### *The Killing Of Brian Thompson Creates a Backlash in Public Sentiment Over UnitedHealth's Dysfunctional Corporate Practices*

231.    During Brian Thompson's tenure as CEO of UnitedHealthcare (2021–2024), the Company pursued a policy of aggressive medical claim denials, contributing to substantial financial gains but also generating widespread public and regulatory criticism. This policy direction was a known reputational risk, which the Board failed to monitor or address in a meaningful way.

232.    On December 4, 2024, Thompson was fatally shot outside of a New York hotel while walking to UnitedHealth Group's investor conference. Media reporting connected the assailant's motive to UnitedHealthcare's coverage denial practices, exposing the Board's failure to anticipate and mitigate reputational fallout from its coverage policies.

233.    For example, on December 5, 2024, the *Boston Globe* published an article entitled "UnitedHealthcare denies the most claims of any major health insurer; data show," reporting that UnitedHealthcare "dismissed about one in every three claims in 2023 — the most of any major insurer. That's twice the industry average of 16 percent."[42] This article documented the Company's denial rate as the highest among major U.S. insurers, thereby spotlighting systemic issues in its claims processing that had been ignored by the Board.

234.    Similarly, a December 5, 2024 *Forbes* article, titled "UnitedHealthcare Denies More Claims Than Other Insurers — Angering Patients And Health Systems", reported that UnitedHealthcare had adopted new policies effective December 1, 2024, enabling it to deny

---

[42] Neena Hagen, *UnitedHealthcare denies the most claims of any major health insurer; data show*, Boston Globe (Dec. 5, 2024), https://www.bostonglobe.com/2024/12/05/data/unitedhealthcare-claim-denial-rates/.

charges for "routine" inpatient or outpatient services.[43] Legal analysts from Davis Wright Tremaine LLP warned that this policy would give the insurer more leeway to deny specific line-item charges.

235.    The *Forbes* article noted that, in the hours following Mr. Thompson's murder, there was an outpouring of public anger online, with one viral X post stating: "When you shoot one man in the street, it's murder. When you kill thousands by taking away their ability to get treatment you're an entrepreneur."

236.    In a December 2024 interview with *HuffPost*, Senator Warren criticized UnitedHealthcare's practices and connected the public's vitriolic reaction to Thompson's death to a loss of faith in the ability of insurers to deliver care fairly.[44] She stated: "The visceral response from people across this country who feel cheated, ripped off, and threatened by the vile practices of their insurance companies should be a warning to everyone in the health care system."

237.    As reported by *The Daily Beast* and summarized by *Yahoo News* on December 5, 2024, verified physicians on Reddit, posting anonymously but confirmed by reporters, expressed sympathy for Thompson's family while condemning the human toll of UnitedHealthcare's coverage denials.[45] One physician wrote: "I cannot even guess how many person-years UHC has taken from patients and their families through denials... it's hard for me to sympathize when so

---

[43] Amy Feldman, *UnitedHealthcare Denies More Claims Than Other Insurers — Angering Patients And Health Systems*, FORBES (Dec. 5, 2024), https://www.forbes.com/sites/amyfeldman/2024/12/05/unitedhealthcare-denies-more-claims-than-other-insurers---angering-patients-and-health-systems/.

[44] Igor Bobic, *'This Is A Warning': Warren, Sanders Address Sympathy For UnitedHealthcare CEO Killing*, HUFFPOST (Dec. 10, 2024), https://www.huffpost.com/entry/warren-sanders-brian-thompson-health-care_n_6758bc0fe4b063b52a9a524b.

[45] Sean Craig, *Moderators Delete Reddit Thread as Doctors Torch Dead UnitedHealthcare CEO*, DAILY BEAST (Dec. 5, 2024), https://www.yahoo.com/news/medical-subreddit-deletes-thread-unitedhealthcare-155829903.html.

many people have suffered because of his company."

238.    On December 7, 2024, the *BBC* published an article titled "Killing of insurance CEO reveals simmering anger at US health system," which described widespread resentment of UnitedHealthcare's coverage denials.[46] The article quoted a terminally ill patient who left UnitedHealthcare due to medication denials and also reported that public reactions to Thompson's death included viral jokes and celebratory messages.

239.    On December 8, 2024, it was revealed in a *Forbes* article titled "Why Overlooking Public Criticism Could Be UnitedHealth's Big Mistake", that CEO Witty made "a critical crisis communication error by dismissing online backlash as noise in a leaked internal video":

> Reading from what appeared to be prepared notes off to the side of his computer, Witty emphasized resilience and reflected on Thompson's legacy. But when he referred to public criticism as "mere noise" and "not in tune with reality," it stood out. Those comments were brief, lasting only a few seconds in the three-minute video, but they left a mark - a significant reputational misstep.[47]

240.    During the days, weeks, and months after Mr. Thompson's death, upon information and belief, the Board: (1) failed to investigate adequately operational practices identified in media articles as exacerbating public harm; (2) ignored reputational fallout documented in real-time social commentary; (3) failed to respond adequately to international media framing the Company as a symbol of health system dysfunction; (4) disregarded warnings by political leaders in high-profile press interviews; and/or (5) failed to investigate adequately or publicly respond to medical community criticism of Company practices.

### The Board's Response Was Too Little, Too Late

---

[46] Mike Wendling and Madeline Halpert, *Killing of insurance CEO reveals simmering anger at US health system*, BBC (Dec. 7, 2024), https://www.bbc.com/news/articles/cm2eeeep0npo.
[47] Molly McPherson, *Why Overlooking Public Criticism Could Be UnitedHealth's Big Mistake*, FORBES (Dec. 8, 2024), https://www.forbes.com/sites/mollymcpherson/2024/12/08/why-overlooking-public-criticism-could-be-unitedhealths-big-mistake/.

241.    In May 2025, following Mr. Thompson's death and public backlash, the Board abruptly removed CEO Andrew Witty and reinstated former CEO Stephen Hemsley, without disclosing any deliberative process or succession planning to shareholders. This ad hoc leadership change created further instability and undermined investor confidence.

242.    Despite the ongoing reputational crisis and absent performance metrics, the Board authorized a $60 million stock award to Hemsley. Proxy advisor ISS and institutional investors opposed this package, citing a lack of performance conditions. The Board's decision suggests corporate waste and disregard for shareholder value.

243.    Only after intense media and social media scrutiny did UnitedHealth announce that it would conduct a review of its policies and practices related to risk assessment, managed care and pharmacy services, which will be looked over by independent experts.[48] This review, limited to pharmacy and managed care practices, was reactive and defensive. The lack of earlier, proactive engagement supports an inference of ongoing *Caremark* oversight failure.

244.    The Company's decision to initiate claims process audits and independent risk evaluations in mid-2025 constitutes a tacit admission that its prior governance and oversight mechanisms were inadequate. These reforms came only after significant reputational harm and are insufficient to immunize the Board from liability.

### *Company Insiders Unload Company Shares at Artificially Inflated Prices*

245.    While in possession of material, adverse, non-public information, certain of the Defendants unloaded their holdings of the Company's common stock at wrongfully inflated prices.

---

[48] Taylor Herzlich, *UnitedHealth investors approve new CEO's $60M pay package despite turmoil following top executive's assassination*, NEW YORK POST (Jun. 2, 2025), https://nypost.com/2025/06/02/business/unitedhealth-investors-approve-60m-stock-award-for-ceo-despite-steep-financial-losses/

Specifically, Defendants Hemsley and Witty (the "Insider Selling Defendants") took advantage of the inflated prices to sell their Company shares for substantial proceeds, in breach of their fiduciary duties.

246.    On September 22, 2021, at the start of the Relevant Period, the Wall Street Journal published an article detailing a report published by OIG demonstrating that insurance companies with Medicare Advantage Plans were leveraging chart reviews and in-home visits to maximize risk-adjusted payments from CMS. On October 25, 2021, well before the truth of the Company's Upcoding Misconduct would be revealed, Defendant Hemsley sold 125,000 shares of Company common stock for sales proceeds of more than $56 million.

247.    In July 2022, before the trial in the First DOJ Action began, the Insider Selling Defendants, aware that the DOJ had uncovered evidence demonstrating that their assurances of "existing firewalls" had been false and misleading, made unusually large sales of Company stock before such evidence would be publicly revealed. Specifically, on July 18, 2022, Defendant Witty sold approximately 11,376 shares of UnitedHealth stock for proceeds of more than $6 million. On July 26, 2022, Defendant Hemsley sold approximately 99,312 shares of UnitedHealth stock for proceeds of more than $53 million.

248.    On October 17, 2023, one week after UnitedHealth was notified of the DOJ Investigation but before it was publicly disclosed, Defendant Hemsley made another sale of approximately 121,515 shares of UnitedHealth stock for proceeds of more than $65.6 million.

249.    Defendant Hemsley continued to sell off his shares of Company stock before news of the DOJ Investigation would become public, unloading approximately 66,081 shares on December 5, 2023, for proceeds of over $36 million.

250.    Thus, in total, during the Relevant Period, the Insider Selling Defendants sold over

433,000 shares of their UnitedHealth stock, reaping over $222.5 million in personal proceeds.

### Repurchases During Relevant Period

251.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $7.9 billion to repurchase approximately 15.3 million shares of its own common stock at artificially inflated prices from April 2022 through February 2024.

252.    According to the Q2 2022 10-Q, between April 1, 2022 and April 30, 2022, the Company repurchased 1,000,000 shares of its common stock at an average price of $528.52 per share, for a total price to the Company of $528,520,000.

253.    As the Company's stock was actually worth only $498.28 per share, the price at closing on February 28, 2024, the Company overpaid by approximately $30,240,000 for repurchases of its own stock between April 1, 2022 and April 30, 2022.

254.    According to the Q3 2022 10-Q, between July 1, 2022 and July 31, 2022, the Company repurchased 600,000 shares of its common stock at an average price of $517.91 per share, for a total price to the Company of $310,746,000.

255.    As the Company's stock was actually worth only $498.28 per share, the price at closing on February 28, 2024, the Company overpaid by approximately $11,778,000 for repurchases of its own stock between July 1, 2022 and July 31, 2022.

256.    According to the Q3 2022 10-Q, between August 1, 2022 and August 31, 2022, the Company repurchased 700,000 shares of its common stock at an average price of $539.26 per share, for a total price to the Company of $377,482,000.

257.    As the Company's stock was actually worth only $498.28 per share, the price at

closing on February 28, 2024, the Company overpaid by approximately $28,686,000 for repurchases of its own stock between August 1, 2022 and August 31, 2022.

258.    According to the Q3 2022 10-Q, between September 1, 2022 and September 30, 2022, the Company repurchased 600,000 shares of its common stock at an average price of $518.97 per share, for a total price to the Company of $311,382,000.

259.    As the Company's stock was actually worth only $498.28 per share, the price at closing on February 28, 2024, the Company overpaid by approximately $12,414,000 for repurchases of its own stock between September 1, 2022 and September 30, 2022.

260.    According to the 2022 10-K, between October 1, 2022 and October 31, 2022, the Company repurchased 700,000 shares of its common stock at an average price of $519.51 per share, for a total price to the Company of $363,657,000.

261.    As the Company's stock was actually worth only $498.28 per share, the price at closing on February 28, 2024, the Company overpaid by approximately $14,861,000 for repurchases of its own stock between October 1, 2022 and October 31, 2022.

262.    According to the 2022 10-K, between November 1, 2022 and November 30, 2022, the Company repurchased 600,000 shares of its common stock at an average price of $533.81 per share, for a total price to the Company of $320,286,000.

263.    As the Company's stock was actually worth only $498.28 per share, the price at closing on February 28, 2024, the Company overpaid by approximately $21,318,000 for repurchases of its own stock between November 1, 2022 and November 30, 2022.

264.    According to the 2022 10-K, between December 1, 2022 and December 31, 2022, the Company repurchased 600,000 shares of its common stock at an average price of $533.56 per share, for a total price to the Company of $320,136,000.

265.    As the Company's stock was actually worth only $498.28 per share, the price at closing on February 28, 2024, the Company overpaid by approximately $21,168,000 for repurchases of its own stock between December 1, 2022 and December 31, 2022.

266.    According to the Q2 2023 10-Q, between April 1, 2023 and April 30, 2023, the Company repurchased 1,200,000 shares of its common stock at an average price of $499.99 per share, for a total price to the Company of $599,988,000.

267.    As the Company's stock was actually worth only $498.28 per share, the price at closing on February 28, 2024, the Company overpaid by approximately $2,052,000 for repurchases of its own stock between April 1, 2023 and April 30, 2023.

268.    According to the Q3 2023 10-Q, between August 1, 2023 and August 31, 2023, the Company repurchased 1,000,000 shares of its common stock at an average price of $501.09 per share, for a total price to the Company of $501,090,000.

269.    As the Company's stock was actually worth only $498.28 per share, the price at closing on February 28, 2024, the Company overpaid by approximately $2,810,000 for repurchases of its own stock between August 1, 2023 and August 31, 2023.

270.    According to the annual report on Form 10-K the Company filed with the SEC on February 28, 2024 (the "2023 10-K"), between October 1, 2023 and October 31, 2023, the Company repurchased 1,000,000 shares of its common stock at an average price of $524.30 per share, for a total price to the Company of $524,300,000.

271.    As the Company's stock was actually worth only $498.28 per share, the price at closing on February 28, 2024, the Company overpaid by approximately $26,020,000 for repurchases of its own stock between October 1, 2023 and October 31, 2023.

272.    According to the 2023 10-K, between November 1, 2023 and November 30, 2023,

the Company repurchased 900,000 shares of its common stock at an average price of $537.53 per share, for a total price to the Company of $483,777,000.

273.     As the Company's stock was actually worth only $498.28 per share, the price at closing on February 28, 2024, the Company overpaid by approximately $35,325,000 for repurchases of its own stock between November 1, 2023 and November 30, 2023.

274.     According to the 2023 10-K, between December 1, 2023 and December 31, 2023, the Company repurchased 900,000 shares of its common stock at an average price of $544.83 per share, for a total price to the Company of $490,347,000.

275.     As the Company's stock was actually worth only $498.28 per share, the price at closing on February 28, 2024, the Company overpaid by approximately $41,895,000 for repurchases of its own stock between December 1, 2023 and December 31, 2023.

276.     According to the quarterly report on Form 10-Q the Company filed with the SEC on May 9, 2024 (the "Q1 2024 10-Q"), between January 1, 2024 and January 31, 2024, the Company repurchased 2,500,000 shares of its common stock at an average price of $513.89 per share, for a total price to the Company of $1,284,725,000.

277.     As the Company's stock was actually worth only $498.28 per share, the price at closing on February 28, 2024, the Company overpaid by approximately $39,025,000 for repurchases of its own stock between January 1, 2024 and January 31, 2024.

278.     According to the Q1 2024 10-Q, between February 1, 2024 and February 29, 2024, the Company repurchased 1,700,000 shares of its common stock at an average price of $515.88 per share, for a total price to the Company of $876,996,000.

279.     As the Company's stock was actually worth only $498.28 per share, the price at closing on February 28, 2024, the Company overpaid by approximately $29,920,000 for

repurchases of its own stock between February 1, 2024 and February 29, 2024.

280.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $317.5 million.

### The Individual Defendants' Knowledge

281.    Throughout the Relevant Period, the Individual Defendants had access to materials pertaining to the Anti-Competitive Misconduct and Upcoding Misconduct and the Company's internal controls such that they knew or recklessly disregarded the true extent of the Anti-Competitive Misconduct, the Upcoding Misconduct, and materially false and/or misleading statements regarding the Anti-Competitive Misconduct, the Upcoding Misconduct, and the Company's firewalls. Unfortunately, they placed their own interests over the interests of the Company and its shareholders.

*The Individual Defendants Are Aware of the Fiduciary Duties Required of Them*

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████

*The Company's Strategy Necessitated Input From the Individual Defendants*

283.    The revenue gained from the Upcoding Misconduct and the Anti-Competitive Misconduct was significant, with the Company receiving $8.7 billion in revenue from diagnoses

that did not lead to treatment in 2021 alone. As such, the Individual Defendants were aware of the benefit provided to the Company.

284.    In addition, the Company was actively training its providers to upcode patients during HouseCalls visits. Audiotapes that were leaked to the media show that Company executives had held meetings with providers so as to coach them to use "buddy codes" and add unnecessary diagnoses to patient charts.

285.    HouseCalls practitioners also utilized Company-issued laptops with pre-loaded software that was designed to guide the practitioner to new diagnoses to add to patients' charts.

286.    Through the Company's acquisition strategy, UnitedHealth aggressively acquired providers and offices until it controlled approximately 10% of all physicians in the country. The Company then encouraged its providers to document as many issues as possible through offering bonuses to physicians who coded a lot of diagnoses while reprimanding those who did not meet the same level of diagnoses.

### The Individual Defendants Knew of the Data Risks Posed by the Change Acquisition Yet Moved Forward Anyway

287.    In December 2021, Defendant Witty testified as part of the First DOJ Action about an audit of the Company's data management that "[g]iven the potential pervasiveness and severity of the observations noted during the assessment,'" the auditors "assigned a rating of ***Needs Improvement to the Data Governance Internal audit.***" Namely, the auditors had identified that Optum had a "heightened risk of data being mismanaged" and that there was "no effective means of enforcement if or when data misuse is discovered or reported'" leading to a "risk that the [Enterprise Data Management Office] will be unable to effectively intervene and reinforce data management practices."

288.    Despite this, according to the Securities Class Action, in a February 21, 2021

internal memorandum, it was emphasized that the Individual Defendants needed to stop focusing

on the data firewalls and instead focus on "Enterprise thinking," stating:

> We have SO much opportunity to put the breadth of our capabilities on full display and achieve true synergy and scale gains from our extensive capabilities. *We need to stop thinking that just because we need to have financial and data firewalls between Optum and UHC means we can't show up together and harness the capabilities of both organizations together. We need to take a deep look at how success is defined for each operating unit and how performance is rewarded and stop any compensation / reward plans that unintentionally inhibit Enterprise thinking or worse create moral hazards or incongruency with our strategic growth objectives*. We need to improve our CRM systems and stop operating with many different instances of sales force that don't talk to another at some level. We need to continue the Enterprise Growth work aimed at building a total comprehensive view of our top existing and prospective accounts.

***The Individual Defendants Were Aware of the DOJ Investigation Yet Failed to Inform Investors***

289.    On October 10, 2023, the Company received notice that the DOJ had launched the

DOJ Investigation into the Company regarding the Anti-Competitive Misconduct and the

Upcoding Misconduct.

███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

███████████████████████████████████████

[REDACTED]

294.    Despite having received these litigation updates, the investing public would not learn of the DOJ Investigation for over four months, *The Wall Street Journal* (and notably, not the Company) published its article on February 27, 2024.

**Proxy Allegations**

295.    In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants caused the Company to issue  false and misleading statements and material omissions in the Company's 2022, 2023, 2024, and 2025 Proxy Statements, each filed with SEC for annual meeting of shareholders. The Proxy Statements solicited shareholder votes on critical matters, including the election of directors, advisory approval of executive compensation, and ratification of the independent auditor.

296.    The Proxy Statements were false and misleading because each contained material misrepresentations and omitted material facts necessary to make the statements therein not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated

thereunder.

297.    These violations misled shareholders about UnitedHealth's financial performance, governance, compliance, and strategic priorities, particularly concerning its Medicare Advantage upcoding practices and DOJ antitrust investigations.

298.    Each Proxy Statement misrepresented UnitedHealth's commitment to ethical conduct, robust oversight, and value-based care, while omitting significant risks related to improper Medicare Advantage reimbursements and anti-competitive practices under DOJ scrutiny. These deficiencies influenced shareholder votes on director elections, executive compensation, and other proposals, causing harm to shareholders who relied on the misleading Proxy Statements.

### 2022 Proxy Statement

299.    The Company filed its 2022 Proxy Statement on April 22, 2022, disclosing information for UnitedHealth's Annual Meeting on June 6, 2022, covering corporate governance, executive compensation, board composition, and business performance (the "2022 Proxy Statement").

300.    The 2022 Proxy Statement stated the following regarding the Board's role in risk oversight at the Company:

> Our Board oversees management's enterprise-wide risk management activities and ensuring that risk matters are appropriately brought to the Board and/or its committees for review. Risk management activities include assessing and taking actions necessary to manage risk incurred in connection with the long-term strategic direction and operation of our business. Our enterprise-wide risk management program has a strong partnership with senior business leaders, who actively drive key risk identification and estimates. We maintain robust internal processes to identify key short-term, intermediate, and long-term risks and document underlying risk drivers, focusing management's risk assessment and mitigation activities against those drivers. Risk drivers are evaluated based on their immediacy, the industry to which they are specific and the nature of the risk. Both the Principles of Governance and the Board's leadership structure facilitate our Board's oversight of risk and communication with management regarding these activities.
>
> Each director on our Board is required to have risk oversight ability for each skill

and attribute the director possesses as reflected in the collective skills section of our director skills matrix described on page 9 [of the 2022 Proxy]. Each of our Board's committees is responsible for oversight of risk management practices for categories of risks relevant to their functions.

* * *

Our Board oversees the work of its various committees by receiving regular reports from the Committee Chairs regarding their work. In addition, discussions about the Company's culture, strategic plan, consolidated and segment business results, capital structure, merger and acquisition-related activities and other business discussed with the Board include a discussion of the risks associated with the particular item under consideration. Our Board and Board committees also have authority to retain independent advisers. Our Board's and committee's respective processes for managing cybersecurity risk oversight, artificial intelligence oversight, quality and patient safety oversight and incentive compensation risk are set forth below.

301.    The 2022 Proxy Statement emphasized UnitedHealth's purportedly strong performance, ethical governance, and commitment to compliance, positioning the Company as a leader in healthcare with effective oversight mechanisms. With respect to the Company's Code of Conduct, the 2022 Proxy stated, in relevant part:

The Company's Code of Conduct (Code), adopted by the UnitedHealth Group Board of Directors, sets expectations for ethical conduct across our company, including but not limited to, integrity, accountability, fair competition and fair dealing, privacy and information security, our assets and the environment, government interactions, communications and marketing and a safe and supportive work environment. The Code also describes the process to report potential misconduct, whistleblower protections, non-retaliation policies and the repercussions for violation of the Code (including termination and possible legal action). The Code is available on the Company's website.

Any waiver of the Code for the Company's executive officers, senior financial officers or directors may be made only by the Board or a committee of the Board. We will publish any amendments to the Code, as well as any waivers of the Code for an executive officer or director, on our website. Our entire global workforce, including applicable contractors and part-time employees, receives periodic training on our Code and other ethical standards.

302.    The Individual Defendants caused the 2022 Proxy Statement to be false and misleading by failing to disclose that (1) the risk oversight functions of the Board and its

committees were not being performed as described, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board; and (2) though the 2022 Proxy Statement claimed the Company's Code of Conduct applied to the Company's officers and directors, the Individual Defendants violated the Code of Conduct with no consequences.

303.    The Individual Defendants caused the 2022 Proxy Statement to be false and misleading and failed to disclose material facts necessary to make the statement therein not false and misleading. Specifically, the 2022 Proxy Statement failed to disclose that: (1) the Company and the Individual Defendants were engaging in the Anti-Competitive Misconduct and the Upcoding Misconduct; (2) through these schemes, the Individual Defendants opened the Company to a significant risk of litigation once the scheme was inevitably uncovered; (3) the Company overstated the capabilities of Optum's firewalls while actively concealing Optum's ability to circumvent those same firewalls; and (4) this too opened the Company up to a significant risk of investigation and litigation.

304.    Additionally, the 2022 Proxy failed to disclose that the Upcoding Misconduct resulted in $8.7 billion of revenue for the Company in 2021 and that the September 2021 OIG report flagged $3.2 billion in questionable payments. These omissions conceal material risks of CMS clawbacks, FCA liabilities, and DOJ penalties, which a reasonable investor would consider important. The 2022 Proxy Statement's reporting of 2021 financial metrics was misleading because such metrics were inflated by improper Medicate Advantage payments resulting from the Upcoding Misconduct.

305.    The 2022 Proxy Statement also omitted mention of the First DOJ Action challenging the Change acquisition, a $13 billion transaction with significant antitrust risks. This omission is material, as it affected shareholders' evaluation of UnitedHealth's growth and

governance.

306.    The 2022 Proxy Statement's defense of "pay-for-performance" and "clawback" policies" was further misleading because such bonuses were tied to fraudulent revenues and executives profited from insider trading amid antitrust risks.

### The 2023 Proxy Statement

307.    The 2023 Proxy Statement, filed with SEC on or about April 21, 2023, for the Annual Meeting of Shareholders held on June 5, 2023, contained material misrepresentations and omissions that rendered it false and misleading.

308.    The 2023 Proxy Statement contained provisions substantially similar to the 2022 Proxy Statement regarding risk oversight and the Board's role in risk assessment and risk management, as well as the Company's Code of Conduct. The 2023 Proxy Statement also highlighted Company awards for quality, social responsibility, and innovation, including a top ranking in the insurance/managed care sector on Fortune's 2023 "World's Most Admired Companies" list.

309.    As such, the 2023 Proxy Statement misrepresented UnitedHealth's commitment to ethical conduct, robust oversight, and value-based care, while omitting material risks stemming from improper Medicare Advantage reimbursements and anti-competitive practices under DOJ scrutiny. The Individual Defendants caused the 2023 Proxy Statement to be false and misleading by failing to disclose that (1) the risk oversight functions of the Board and its committees were not being performed as described, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board; and (2) though the 2023 Proxy Statement claimed the Company's Code of Conduct applied to the Company's officers and directors, the Individual Defendants violated the Code of Conduct with no consequences. These deficiencies inflated the perceived value of UnitedHealth's stock and misled shareholders evaluating governance, executive

compensation, and business performance.

310.    The 2023 Proxy Statement reported UnitedHealth's 2022 financial performance, stating revenues of $324.2 billion, net earnings of $20.1 billion, adjusted earnings per share ("EPS") of $22.19, and a 7% shareholder return. The 2023 Proxy Statement omitted information that billions in revenue were derived from improper payments obtained through the Upcoding Misconduct, and concealed material risks of CMS clawbacks, False Claims Act penalties, and reduced future payments, which a reasonable investor would consider significant in assessing UnitedHealth's financial sustainability. Moreover, the 2023 Proxy Statement omitted material regulatory risks known before April 2023, including the September 2021 OIG report identifying $3.2 billion in questionable Medicare Advantage payments and the February 2022 First DOJ Action challenging the $13 billion Change acquisition. These risks were material to shareholders evaluating UnitedHealth's governance and compliance framework.

311.    As such, the Individual Defendants caused the 2023 Proxy Statement to be false and misleading and failed to disclose material facts necessary to make the statement therein not false and misleading. Specifically, the 2023 Proxy Statement failed to disclose that: (1) the Company and the Individual Defendants were engaging in the Anti-Competitive Misconduct and the Upcoding Misconduct; (2) through these schemes, the Individual Defendants opened the Company to a significant risk of litigation once the scheme was inevitably uncovered; (3) the Company overstated the capabilities of Optum's firewalls while actively concealing Optum's ability to circumvent those same firewalls; and (4) this too opened the Company up to a significant risk of investigation and litigation.

312.    Furthermore, the 2023 Proxy Statement defended UnitedHealth's pay-for-performance compensation model, noting 94% shareholder support in the "Say on Pay" vote and

stating that executive compensation was tied to financial metrics (e.g., EPS, revenue) and non-financial goals (e.g., ESG), highlighting a broadened clawback policy covering "material detrimental conduct." These statements were misleading, however, because they failed to disclose that the financial metrics underpinning executive bonuses were inflated by billions in improper payments from the Upcoding Misconduct. This inflation resulted in undeserved compensation, misrepresenting the alignment of executive pay with legitimate performance and exposing shareholders to risks of overpayment.

313.    The 2023 Proxy Statement was further misleading because it omitted that the Insider Selling Defendants sold significant amounts of stock during the period. These omissions concealed material risks to compensation governance, as such sales suggested the Insider Selling Defendants were aware of undisclosed liabilities, undermining the 2023 Proxy Statement's claim of aligned incentives.

314.    The Proxy's portrayal of a "consumer-oriented health system" was misleading because UnitedHealth allegedly engaged in anti-competitive practices, including data misuse following the Change acquisition. Inadequate firewalls allowed Optum to access competitor data, suppressing competition and violating healthcare antitrust laws. These practices conflicted with the proxy's innovation and consumer-focused narrative.

### The 2024 Proxy Statement

315.    The 2024 Proxy Statement, filed with the SEC on April 22, 2024, and prepared for UnitedHealth's Annual Meeting on June 3, 2024, provided information on corporate governance, executive compensation, and Board composition.

316.    The 2024 Proxy Statement contained provisions substantially similar to the 2022 Proxy Statement regarding risk oversight and the Board's role in risk assessment and risk management, as well as the Company's Code of Conduct. The 2024 Proxy Statement also

highlighted Company awards for quality, social responsibility, and innovation, including a top ranking in the insurance/managed care sector on Fortune's 2024 "World's Most Admired Companies" list.

317.    As such, the 2024 Proxy Statement misrepresented UnitedHealth's commitment to ethical conduct, robust oversight, and value-based care, while omitting material risks stemming from improper Medicare Advantage reimbursements and anti-competitive practices under DOJ scrutiny. The Individual Defendants caused the 2024 Proxy Statement to be false and misleading by failing to disclose that (1) the risk oversight functions of the Board and its committees were not being performed as described, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board; and (2) though the 2024 Proxy Statement claimed the Company's Code of Conduct applied to the Company's officers and directors, the Individual Defendants violated the Code of Conduct with no consequences. Moreover, the 2024 Proxy Statement's assertion that UnitedHealth received awards for "social responsibility" and "quality" was false and/or misleading because the Company's Medicare Advantage practices allegedly harmed patients by adding false diagnoses to medical charts, causing distress and potential mistreatment. Whistleblower accounts, including a physician describing upcoding as "unconscionable," and media reports from sources like *The Wall Street Journal* and *STAT News*, revealed systemic upcoding that contradicted the ethical and quality standards implied by these awards. These deficiencies inflated the perceived value of UnitedHealth's stock and misled shareholders evaluating governance, executive compensation, and business performance.

318.    The 2024 Proxy Statement reported that UnitedHealth achieved 2023 financial performance of $371.6 billion in revenues, $22.4 billion in net earnings, $25.12 adjusted EPS, and a 123% five-year shareholder return. The 2024 Proxy Statement omitted information, however,

that billions in revenue were derived from improper payments obtained through the Upcoding Misconduct, and concealed material risks of CMS clawbacks, False Claims Act penalties, and reduced future payments, which a reasonable investor would consider significant in assessing UnitedHealth's financial sustainability.

319. As such, the Individual Defendants caused the 2024 Proxy Statement to be false and misleading and failed to disclose material facts necessary to make the statement therein not false and misleading. Specifically, the 2024 Proxy Statement failed to disclose that: (1) the Company and the Individual Defendants were engaging in the Anti-Competitive Misconduct and the Upcoding Misconduct; (2) through these schemes, the Individual Defendants opened the Company to a significant risk of litigation once the scheme was inevitably uncovered; (3) the Company overstated the capabilities of Optum's firewalls while actively concealing Optum's ability to circumvent those same firewalls; and (4) this too opened the Company up to a significant risk of investigation and litigation.

320. Moreover, the 2024 Proxy Statement represented that UnitedHealth's executive compensation followed a pay-for-performance model, with 96% shareholder support in the 2023 Say on Pay vote, tying compensation to financial metrics (e.g., EPS, revenue) and non-financial goals (e.g., ESG), and highlighted a broadened clawback policy covering "material detrimental conduct". The 2024 Proxy Statement's justification of executive bonuses based on 2023 financial metrics was false and/or misleading because it omitted that these metrics were inflated by improper Medicare Advantage payments resulting from the Upcoding Misconduct and Anti-Competitive Misconduct. This inflation resulted in undeserved compensation, misrepresenting the alignment of executive pay with legitimate performance and exposing shareholders to risks of overpayment, misleading those voting on the Say on Pay proposal.

***The 2025 Proxy Statement***

-85-

321.    UnitedHealth's 2025 Proxy Statement, filed with the SEC on or about April 21, 2025, for the Annual Meeting of Shareholders held on June 2, 2025, contained material misrepresentations and omissions that rendered it false and/or misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder. These misrepresentations and omissions misled shareholders about the Company's financial performance, governance, compliance, and strategic priorities, influencing votes on director elections, executive compensation, auditor ratification, and a shareholder proposal.

322.    The 2025 Proxy Statement contained provisions substantially similar to the 2022 Proxy Statement regarding risk oversight and the Board's role in risk assessment and risk management, as well as the Company's Code of Conduct. The 2025 Proxy Statement also highlighted Company awards for quality, social responsibility, and innovation, including a top ranking in the insurance/managed care sector on Fortune's 2025 "World's Most Admired Companies" list.

323.    As such, the 2025 Proxy Statement misrepresented UnitedHealth's commitment to ethical conduct, robust oversight, and value-based care, while omitting material risks stemming from improper Medicare Advantage reimbursements and anti-competitive practices under DOJ scrutiny. The Individual Defendants caused the 2025 Proxy Statement to be false and misleading by failing to disclose that (1) the risk oversight functions of the Board and its committees were not being performed as described, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board; and (2) though the 2025 Proxy Statement claimed the Company's Code of Conduct applied to the Company's officers and directors, the Individual Defendants violated the Code of Conduct with no consequences. Moreover, whistleblower accounts and media reports from sources including *The Wall Street Journal* and *STAT News*

revealed systemic upcoding, undermining the 2025 Proxy Statement's claims and misleading shareholders about the Company's ethical performance when voting on governance-related proposals.

324.    The 2025 Proxy Statement represented that UnitedHealth achieved 2024 financial performance of $400.3 billion in revenues, $14.4 billion in net earnings, $27.66 adjusted EPS, 15.9% return on equity, and an 83% five-year shareholder return. The 2025 Proxy Statement omitted information, however, that billions in revenue were derived from improper payments obtained through the Upcoding Misconduct and Anti-Competitive Misconduct, and concealed material risks of CMS clawbacks, False Claims Act penalties, and reduced future payments, which a reasonable investor would consider significant in assessing UnitedHealth's financial sustainability.

325.    Accordingly, the Individual Defendants caused the 2025 Proxy Statement to be false and misleading and failed to disclose material facts necessary to make the statement therein not false and misleading. Specifically, the 2025 Proxy Statement failed to disclose that: (1) the Company and the Individual Defendants were engaging in the Anti-Competitive Misconduct and the Upcoding Misconduct; (2) through these schemes, the Individual Defendants opened the Company to a significant risk of litigation once the scheme was inevitably uncovered; (3) the Company overstated the capabilities of Optum's firewalls while actively concealing Optum's ability to circumvent those same firewalls; and (4) this too opened the Company up to a significant risk of investigation and litigation.

326.    Additionally, the 2025 Proxy Statement's statements concerning costs stemming from the Change cyberattack were misleading because they omitted that the 2024 breach stemmed from inadequate data firewalls, constituting a governance failure. This omission understated the

breach's impact on compliance and risk management, misleading shareholders voting on directors responsible for oversight and the ratification of the independent auditor.

327.    The 2025 Proxy Statement was further misleading because it omitted material regulatory risks known before April 2025, including OIG reports on questionable Medicare Advantage payments and the DOJ antitrust investigation initiated in 2023. These risks suggested potential non-compliance and penalties, material to shareholders evaluating the board's governance effectiveness. Their omission rendered the Proxy's ethical and oversight claims false, influencing votes on director nominees.

328.    The Proxy Statement's justification of executive bonuses based on 2024 financial metrics was false and/or misleading because these metrics were inflated by improper Medicare Advantage payments resulting from the Upcoding Misconduct and Anti-Competitive Misconduct. This inflation resulted in undeserved compensation, misrepresenting alignment with legitimate performance and misleading shareholders voting on the Say on Pay proposal by concealing risks of overpayment.

329.    The 2025 Proxy Statement also represented that UnitedHealth's strategic priorities included value-based care, health technology, pharmacy services, health benefits, and health financial services, leveraging Optum's technology and data to create a "modern, high-performing health system" delivering "better health outcomes" and affordability.

330.    However, the 2025 Proxy Statement's claim of advancing a value-based care ("VBC") model with "better outcomes" was false and/or misleading because Optum's HouseCalls program systematically upcoded diagnoses, prioritizing revenue over quality. The Upcoding Misconduct harmed patients through false diagnoses and inflated CMS costs, contradicting VBC principles and misleading shareholders voting on directors responsible for strategic oversight.

331.   The 2025 Proxy Statement's portrayal of a "high-performing health system" was false and/or misleading because UnitedHealth allegedly engaged in the Anti-Competitive Misconduct, as detailed above and alleged herein. This undermined the 2025 Proxy Statement's innovation narrative, misleading shareholders voting on directors overseeing strategic integrity.

332.   The 2025 Proxy Statement was misleading by omitting that the Upcoding Misconduct and Anti-Competitive Misconduct could disrupt strategic priorities, including value-based care and technology initiatives. These risks, involving potential CMS penalties and DOJ enforcement actions, were material to shareholders evaluating long-term growth objectives, rendering the 2025 Proxy Statement's strategic claims false and influencing votes on directors responsible for strategy.

333.   The 2025 Proxy Statement was further misleading because it omitted known red flags, including OIG reports on Medicare Advantage payments and the DOJ antitrust investigation initiated in 2023, which indicated significant compliance risks.

## DAMAGES TO UNITEDHEALTH

334.   As a direct and proximate result of the Individual Defendants' misconduct, UnitedHealth has lost and will continue to lose and expend many millions of dollars.

335.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

336.   Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, including the Anti-Competitive Misconduct and the Upcoding Misconduct, and amounts paid to outside lawyers,

accountants, and investigators in connection thereto.

337.    Such expenditures will also include costs incurred in any internal investigations pertaining to the DOJ Investigation, violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

338.    Such losses include the Company's overpayment of approximately $317.5 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

339.    Additionally, these expenditures include, but are not limited to, lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

340.    As a direct and proximate result of the Individual Defendants' conduct, UnitedHealth has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

341.    Plaintiff brings this action derivatively and for the benefit of UnitedHealth to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors and/or officers of UnitedHealth, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and the aiding and abetting thereof.

342.    UnitedHealth is named solely as a nominal party in this action. This is not a

collusive action to confer jurisdiction on this Court that it would not otherwise have.

343.    Plaintiff is, and has been at all relevant times, a shareholder of UnitedHealth. Plaintiff will adequately and fairly represent the interests of UnitedHealth in enforcing and prosecuting her rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

344.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

345.    A pre-suit demand on the Board of UnitedHealth is futile and, therefore, excused. At the time this action was commenced, the nine-member Board consisted of Individual Defendants Hemsley, Baker, Flynn, Garcia, Gil, Hooper, McNabb, Montgomery Rice, and Noseworthy (the "Director Defendants"). As set forth below, all nine Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

346.    The acts complained herein constitute violations of fiduciary duties owed by UnitedHealth's officers and directors, and these acts are incapable of ratification.

347.    The Director Defendants face a substantial likelihood of liability for their individual misconduct. In complete abdication of their fiduciary duties, the Director Defendants knowingly or recklessly made, or allowed to be made, material misrepresentations and/or omissions for the purpose and effect of concealing the Company's financial well-being and prospects from the investing public and supporting the artificially inflated price of UnitedHealth's securities. For

example, ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ This meeting is

evidence that the Director-Defendants had knowledge of the DOJ Investigation and underlying

misconduct yet failed to inform the public in a timely manner. As a result of the foregoing, the

Director Defendants face a substantial likelihood of liability and are not disinterested, rendering

any demand futile.

348.    In addition, the Director Defendants willfully ignored, or recklessly failed to inform

themselves of, the obvious problems with the Company's internal controls, practices and

procedures. The failure to make a good faith effort to oversee the Company's internal controls, as

well as to remedy and prevent the misconduct described above, is a breach of the Director

Defendants' fiduciary duties to the Company. Furthermore, the conscious disregard of the duty to

monitor UnitedHealth's controls led to the waste of corporate assets. The Director Defendants thus

face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and

thus excused.

349.    The Director Defendants, as members of the Board, were and are subject to the

Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties

required by applicable laws, rules, and regulations, requiring the Director Defendants to also

adhere to the Company's standards of business conduct. The Director Defendants violated the Code

of Conduct because they knowingly or recklessly participated in making and/or causing the

Company to make the materially false and misleading statements alleged herein and failed to

ensure that proper firewall procedures were in place. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

350.    Demand is further excused as to Defendant Hemsley. Defendant Hemsley served as Executive Chair of the Board from 2017 to 2019, CEO of UnitedHealth from 2006 to 2017, President of UnitedHealth from 1999 to 2014, and Chief Operating Officer of UnitedHealth from 1998 to 2006. The Company provides Defendant Hemsley with significant compensation for his role a director of UnitedHealth. The 2025 Proxy Statement notes that in 2024, Defendant Hemsley received $856,218 in total compensation. ███████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████ In addition, according to the 2025 Proxy Statement, the Board determined that Defendant Hemsley is not independent per NYSE's standards on director independence. Moreover, Defendant Hemsley is a named defendant in the Securities Class Action. Accordingly, Defendant Hemsley could not disinterestedly or independently consider a demand or to prosecute this action.

351.    Furthermore, Defendant Hemsley was an active participant in the misconduct described above, having signed the 2022 10-K, the 2023 10-K, and the 2024 10-K, and having solicited the 2022, 2023, 2024, and 2025 Proxy Statements. Defendant Hemsley therefore faces a substantial likelihood of liability.

352.    In addition, Defendant Hemsley received a material personal benefit that was not shared with other stockholders and sold UnitedHealth stock while in the possession of material nonpublic company information. UnitedHealth was aware of the DOJ investigation since at least

October 2023. Between October 2023 and February 2024, when the DOJ investigation came to light, Defendant Hemsley sold $102 million of his personally held UnitedHealth stock █████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████ In doing so, Defendant Hemsley has exposed himself to criminal liability and heightened civil liability and damages. These insider sales, occurring during the Relevant Period, create a further likelihood of additional significant liability, thus making Defendant Hemsley neither disinterested nor independent.

353.    Demand is further excused as to Defendant Baker. Defendant Baker has served as a Company director since 2023. He is also a member of the Audit and Finance Committee. The Company provides Defendant Baker with significant compensation for his role as stated above. The 2025 Proxy Statement notes that in 2024, Defendant Baker received $366,072 in total compensation. Furthermore, Defendant Baker was an active participant in the misconduct described above, having signed the 2024 10-K and having solicited the 2024 and 2025 Proxy Statements. This lack of independence and the financial benefits received by Defendant Baker render him incapable of impartially considering a demand to commence and vigorously prosecute this action.

354.    Demand is further excused as to Defendant Flynn. Defendant Flynn served as a Company director since 2017. The Company provides Defendant Flynn with significant compensation for his role as stated above. The 2025 Proxy Statement notes that in 2024, Defendant Flynn received $400,765 in total compensation. Defendant Flynn is not otherwise employed. █

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

Furthermore, Defendant Flynn was an active participant in the misconduct described above, having signed the 2022 10-K, the 2023 10-K, and the 2024 10-K, and having solicited the 2022, 2023, 2024, and 2025 Proxy Statements. This lack of independence and the financial benefits received by Defendant Flynn render him incapable of impartially considering a demand to commence and vigorously prosecute this action.

355.    Demand is further excused as to Defendant Garcia. Defendant Garcia has served as a Company director since 2021. He is also a member of the Audit and Finance Committee. The Company provides Defendant Garcia with significant compensation for his role as stated above. The 2025 Proxy Statement notes that in 2024, Defendant Garcia received $366,567 in total compensation. Defendant Garcia is not otherwise employed. Furthermore, Defendant Garcia was an active participant in the misconduct described above, having signed the 2022 10-K, the 2023 10-K, and the 2024 10-K, and having solicited the 2022, 2023, 2024, and 2025 Proxy Statements. This lack of independence and the financial benefits received by Defendant Garcia render him incapable of impartially considering a demand to commence and vigorously prosecute this action.

356.    Demand is further excused as to Defendant Gil. Defendant Gil has served as a Company director since 2022. She is also a member of the Audit and Finance Committee. The Company provides Defendant Gil with significant compensation for her role as stated above. The 2025 Proxy Statement notes that in 2024, Defendant Gil received $514,769 in total compensation.

Defendant Gil does not serve on any other public company's board of directors, and is not otherwise employed. Furthermore, Defendant Gil was an active participant in the misconduct described above, having signed the 2023 10-K and the 2024 10-K and having solicited the 2023, 2024, and 2025 Proxy Statements. This lack of independence and the financial benefits received by Defendant Garcia render her incapable of impartially considering a demand to commence and vigorously prosecute this action.

357. Demand is further excused as to Defendant Hooper. Defendant Hooper has served as a Company director since 2007. The Company provides Defendant Hooper with significant compensation for her role as stated above. The 2025 Proxy Statement notes that in 2024, Defendant Hooper received $441,349 in total compensation. Furthermore, Defendant Hooper was an active participant in the misconduct described above, having signed the 2022 10-K, the 2023 10-K, and the 2024 10-K, and having solicited the 2022, 2023, 2024, and 2025 Proxy Statements. This lack of independence and the financial benefits received by Defendant Hooper render her incapable of impartially considering a demand to commence and vigorously prosecute this action.

358. Demand is further excused as to Defendant McNabb. Defendant McNabb has served as a Company director since 2018. He is also a member of the Audit and Finance Committee. The Company provides Defendant McNabb with significant compensation for his role as stated above. The 2025 Proxy Statement notes that in 2024, Defendant McNabb received $393,602 in total compensation. Defendant McNabb is not otherwise employed. Furthermore, Defendant McNabb was an active participant in the misconduct described above, having signed the 2022 10-K, the 2023 10-K, and the 2024 10-K, and having solicited the 2022, 2023, 2024, and 2025 Proxy Statements. This lack of independence and the financial benefits received by Defendant McNabb render him incapable of impartially considering a demand to commence and

vigorously prosecute this action.

359.    Demand is further excused as to Defendant Montgomery Rice. Defendant Montgomery Rice has served as a Company director since 2017. The Company provides Defendant Montgomery Rice with significant compensation for her role as stated above. The 2025 Proxy Statement notes that in 2024, Defendant Montgomery Rice received $424,262 in total compensation. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████  Furthermore, Defendant Montgomery Rice was an active participant in the misconduct described above, having signed the 2022 10-K, the 2023 10-K, and the 2024 10-K and having solicited the 2022, 2023, 2024, and 2025 Proxy Statements. This lack of independence and the financial benefits received by Defendant Montgomery Rice render her incapable of impartially considering a demand to commence and vigorously prosecute this action.

360.    Demand is further excused as to Defendant Noseworthy. Defendant Noseworthy has served as a Company director since 2019. The Company provides Defendant Noseworthy with significant compensation for his role as stated above. The 2025 Proxy Statement notes that in 2024, Defendant Noseworthy received $390,756 in total compensation. Defendant Noseworthy does not serve on any other public company's board of directors, and is not otherwise employed. Furthermore, Defendant Noseworthy was an active participant in the misconduct described above, having signed the 2022 10-K, the 2023 10-K, and the 2024 10-K, and having solicited the 2022, 2023, 2024, and 2025 Proxy Statements. This lack of independence and the financial benefits received by Defendant Noseworthy render him incapable of impartially considering a demand to

commence and vigorously prosecute this action.

361.    Demand is further excused as to Defendants Baker, Garcia, Gil, Hooper, and McNabb, who served on the Audit and Finance Committee during the Relevant Time Period. The Audit and Finance Committee represents and assists the Board with oversight of the Company's compliance with legal and regulatory requirements, the efficacy of the Company's enterprise risk management structure and key processes, and the integrity of the financial reporting processes. One of the Audit and Finance Committee's responsibilities is to ensure that the Company's financial statements, reports, and other financial information disclosed to the public complies with legal requirements. Another responsibility is to review and assess the effectiveness of the Company's policies, procedures and resource commitment concerning data protection. The Audit and Finance Committee was thus responsible for reviewing and approving UnitedHealth's press releases, conferences with investors and analysts, and Forms 10-Q and 10-K filed between March 2022 and February 27, 2024. Defendants Baker, Garcia, Gil, Hooper, and McNabb were members of the Audit and Finance Committee during the relevant time period and were thus responsible for knowingly or recklessly allowing the improper statements related to the Company's data protection policies. ██████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

Accordingly, Defendants Baker, Garcia, Gil, Hooper, and McNabb breached their fiduciary duty

of loyalty and good faith because they participated in the misconduct described above. They face a substantial likelihood of liability for these breaches, making any demand on them futile.

362.    Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

**FIRST CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

363.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

364.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of UnitedHealth's business and affairs.

365.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

366.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of UnitedHealth.

367.    In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the Anti-Competitive Misconduct and the Upcoding Misconduct.

368.    In breach of their fiduciary duties owed to UnitedHealth, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company and the Individual Defendants were engaging in the Anti-Competitive Misconduct and the Upcoding Misconduct; (2) through these schemes, the Individual Defendants opened the Company

to a significant risk of litigation once the scheme was inevitably uncovered; (3) the Company overstated the capabilities of Optum's firewalls while actively concealing Optum's ability to circumvent those same firewalls; and (4) this too opened the Company up to a significant risk of investigation and litigation. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

369.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

370.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

371.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed, while two of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $163.1 million.

372.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or

recklessly and for the purpose and effect of artificially inflating the price of UnitedHealth's securities.

373.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the Anti-Competitive Misconduct and the Upcoding Misconduct and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the Anti-Competitive Misconduct and the Upcoding Misconduct, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the Anti-Competitive Misconduct and the Upcoding Misconduct and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

374.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of UnitedHealth's securities. The Individual Defendants, in good faith, should have taken appropriate action to

correct the schemes alleged herein and to prevent them from continuing to occur.

375.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

376.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, UnitedHealth has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

377.    Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## SECOND CLAIM
### Against Individual Defendants for Unjust Enrichment

378.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

379.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, UnitedHealth.

380.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from UnitedHealth that was tied to the performance or artificially inflated valuation of UnitedHealth, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

381.    Plaintiff, as a shareholder and representative of UnitedHealth, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, payments to the Individual Defendants, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based

compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

382.     Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

**THIRD CLAIM**
**Against Individual Defendants for Abuse of Control**

383.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

384.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence UnitedHealth, for which they are legally responsible.

385.     As a direct and proximate result of the Individual Defendants' abuse of control, UnitedHealth has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

386.     Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

**FOURTH CLAIM**
**Against Individual Defendants for Gross Mismanagement**

387.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

388.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of UnitedHealth in a manner consistent with the operations of a publicly-held corporation.

389.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, UnitedHealth has sustained and will continue to sustain significant damages.

390.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

391.    Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

**FIFTH CLAIM**
**Against Individual Defendants for Waste of Corporate Assets**

392.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

393.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees to the detriment of the shareholders and the Company.

394.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused UnitedHealth to waste valuable corporate assets while UnitedHealth suffered from undisclosed issues. The Individual Defendants' misconduct has caused the Company to incur many millions of dollars of legal liability and/or costs to defend against actions and investigations, including the Securities Class Action and the DOJ Investigation, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

395.    In addition, the Individual Defendants caused the Company to repurchase 14 million shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

396.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

397.    Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

**SIXTH CLAIM**

**Against Individual Defendants for Violations of Section 14(a) of the Exchange Act**

398.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

399.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

400.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

401.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

402.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts the statements contained

in the 2022, 2023, 2024, and 2025 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

403.    The false and misleading elements of the annual Proxy Statements led to the re-elections of several of the Individual Defendants to the Board, allowing them to continue breaching their fiduciary duties to UnitedHealth.

404.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

405.    Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

**SEVENTH CLAIM**
**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

406.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

407.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding UnitedHealth. Not only is UnitedHealth now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon UnitedHealth by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase *15.3 million* of its own shares at artificially inflated prices, damaging UnitedHealth.

408.    During the Relevant Period, the Individual Defendants also individually and in

-106-

concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

409.    The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about UnitedHealth not misleading.

410.    The Individual Defendants as top executives acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

411.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## EIGHTH CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

412.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

413.    The Individual Defendants, by virtue of their positions with UnitedHealth and their

specific acts, were, at the time of the wrongs alleged herein, controlling persons of UnitedHealth and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause UnitedHealth to engage in the illegal conduct and practices complained of herein.

414.    Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of UnitedHealth, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to UnitedHealth;

(c)    Determining and awarding to UnitedHealth the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing UnitedHealth and the Individual Defendants to take all necessary actions to reform and improve UnitedHealth's corporate governance and internal procedures to comply with applicable laws and to protect UnitedHealth and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of UnitedHealth to nominate at least five candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding UnitedHealth restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

Dated: June 18, 2025                        Respectfully submitted,

**REINHARDT WENDORF & BLANCHFIELD**

*/s/ Garrett D. Blanchfield*
Garrett D. Blanchfield, Jr. (#209855)
Brant D. Penney (#316878)
Roberta A. Yard (#322295)
80 South 8th Street, Suite 900
Minneapolis, MN 55402
Telephone: (651) 287-2100
Email: g.blanchfield@rwblawfirm.com
Email: b.penney@rwblawfirm.com
Email: r.yard@rwblawfirm.com

*Local counsel for Plaintiff*

**THE BROWN LAW FIRM, P.C.**

Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017

Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

**LEVI & KORSINSKY, LLP**

Gregory M. Nespole
Correy A. Suk
Daniel Tepper
33 Whitehall Street, 17th Floor
New York, NY 10004
(212) 363-7500
(516) 344-6204
Email: gnespole@zlk.com
Email: csuk@zlk.com
Email: dtepper@zlk.com

*Additional counsel for Plaintiffs*